**LUBBOCK CIVIL LIBERTIES UNION,**
Plaintiff-Appellant,

v.

**LUBBOCK INDEPENDENT SCHOOL
DISTRICT, et al.,**
Defendants-Appellees.

No. 80–2384.

United States Court of Appeals,
Fifth Circuit.

March 11, 1982.

Thomas J. Griffith, Wendell Coffee, Ralph H. Brock, Lubbock, Tex., for plaintiff-appellant.

Albach, Gutow, Rosenberg & Blume, Stephen Gutow, Dallas, Tex., Nathan Z. Dershowitz, American Jewish Congress, New York City, amicus curiae.

McWhorter, Cobb & Johnson, D. Thomas Johnson, Charles L. Cobb, Lubbock, Tex., for defendants-appellees.

Before POLITZ and RANDALL, Circuit Judges, and GORDON *, District Judge.

RANDALL, Circuit Judge:

The Lubbock Civil Liberties Union (LCLU) appeals from a decision of the trial court in its suit brought under 42 U.S.C. §§ 1983 and 1988 for declaratory and injunctive relief, damages and attorneys fees against the Lubbock Independent School District (the District) and several individual defendants. The LCLU alleged various practices and policies of the District constituted an impermissible establishment of religion in violation of the first and fourteenth amendments to the Constitution.

For the reasons set forth below we reverse the judgment of the trial court as to the constitutionality of the current policy.

*I. Facts.*

In September, 1979, the LCLU filed suit seeking an end to various practices in the District which it contended were unconstitutional violations of the establishment clause of the first amendment.[1] Included in these practices were morning Bible readings over school public address systems, classroom prayers led by teachers, a period of silent prayer ended by "Amen" over school public address systems and distribution of "Gideon" Bibles to fifth and sixth grade students.

These allegedly unconstitutional practices had occurred for almost ten years prior to the filing of the suit, and were traced to at least 1971, when the record indicates that several complaints were made to the District concerning the presentation of school assemblies "of a Protestant Christian evangelical variety." An attorney for the LCLU discussed the complaint with the District at that time. As a result, a policy relating to religious activities was formulated and is apparently reflected in a letter, dated May 3, 1971, from the District's counsel to the attorney for the LCLU.[2] The policy reflected in the letter called for neutrality of all personnel regarding religious activities, a prohibition against the encouragement of any particular religious activity, the prohibition of any speakers on religion in any assembly, and the discontinuance of what apparently had been a practice of the Gideon Camp's "placing New Testaments in the hands of students." Additionally, the District agreed that prayers given over school public address systems would be stopped, although the letter advised that its recipients should "not be misled" into believing that the District was prohibiting "open prayer."

The evidence adduced at trial, uncontroverted by the District, indicated that the practices complained of in 1971 continued unabated after the "adoption" of the "policy" in 1971. The District wholly failed to discontinue loud speaker prayer and Bible readings in the schools, continued to have assemblies with evangelistic speakers and

---

* District Judge of the Eastern District of Louisiana sitting by designation. Judge Gordon concurred in the above opinion before his death March 4, 1982.

1. The first amendment states in pertinent part:
   Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, . . . .
   U.S.Const., amend I.

2. The letter stated in pertinent part:
   Since our conversation with you, Tom Griffith and Reverend Higgins, of some two weeks ago, we have gone over the matters discussed with Mr. Ed Irons, Superintendent of Schools. He advised us on Thursday of last week that he has had a staff meeting with all school principals and has stressed the school policy that there must be strict neutrality of all personnel regarding religious activities. Teachers are instructed not to encourage any particular religious activity.
   There are to be no speakers on religion at any assembly.
   The practice heretofore employed by the Gideon Society in placing new testaments in the hands of students is to be discontinued.
   Each individual student will be permitted to pray, if he so desires, as his own religion dictates—preferably by silent prayer. It is our feeling that the instructions given by Superintendent Irons bring the School District in compliance with court decisions.
   You are not to be mislead [sic] by this letter into believing that the School District is prohibiting open prayer.

continued the distribution of the Gideon Bibles.[3]

In January, 1979, after further complaints were received in December, 1978 from patrons of the District, the District Board of Trustees, statutorily authorized to make rules and regulations for the District,[4] authorized the first written "policy" on religious activities in the District.[5] This policy was followed by the adoption, in April, 1979, of procedures to implement the policy.[6]

The adoption of the January, 1979 policy did not, however, stem the allegedly unconstitutional Bible reading, religious assemblies, and daily prayers. To the contrary, the District apparently had no intention of altering the practices about which the LCLU had complained as early as 1971 but rather instructed that the practices should be student rather than teacher initiated. The desire to maintain the status quo is, in fact, clearly reflected in the minutes of the meetings of the Board of Trustees.

> In its meeting on January 25, the Board adopted a broad policy regarding religion in the schools, and the administration was instructed to develop procedures and guidelines to implement the policy.

These procedures were adopted by the Board on April 19. The procedure provides that we allow student initiated religious activities. *Basically, this will fairly well continue following our present practice.* You should make the staff aware that we are to comply with the student-centered activity. This provision applies even in the classroom, and teachers are not to promote or initiate the activities. We have the responsibility to provide alternate activities for students who have objections to taking part in any of these programs that we may have.

(emphasis added). The policies and practices complained of continued unabated in the schools and were amply documented in surveys taken by the District in October, 1979. The District does not dispute on appeal that, even after the adoption of the January, 1979 policy, the practices engaged in by the district "fell short of constitutional standards."

In September, 1979, the LCLU filed suit against the District. The case proceeded through discovery toward trial. In August, 1980, after receipt of the pretrial order and docketing of the case for trial, the District radically altered its religious practices poli-

**3.** The District, at trial, alleged that the Bible distribution policy had changed because, after 1971, the Gideons no longer placed the Bibles into the children's hands but merely put the Bibles on tables in an area of the school to facilitate distribution. The students were called by class to voluntarily pick up the Bibles under the watchful eyes of Gideons who had brought the Bibles to the school. This mere change in method does not, as found by the trial court, clothe the activity in constitutionality.

The Gideon Camp ceased distribution of the Bibles some time after October, 1979, because of complaints they had received.

**4.** Section 23.26 of the Texas Education Code states:

(a) The trustees shall constitute a body corporate and in the name of the school district may acquire and hold real and personal property, sue and be sued, and receive bequests and donations or other moneys or funds coming legally into their hands.

(b) The trustees shall have the exclusive power to manage and govern the public free schools of the district.

(c) All rights and titles to the school property of the district, whether real or personal, shall be vested in the trustees and their successors in office.

(d) The trustees may adopt such rules, regulations, and by-laws as they may deem proper.

Tex.Ed.Code Ann. § 23.26 (Vernon).

**5.** The policy reads as follows:

Insofar as religion is concerned, the Lubbock Independent School District adheres to the principle of freedom of religion as expressed in the Constitution of the United States and the Constitution of the State of Texas.

**6.** The procedures adopted are as follows:

No school employee shall compose, prescribe, or place his/her approval upon any particular prayer or form of religious activity; however, student initiated and directed religious activities will be permitted.

The Lubbock Independent School District will allow the teaching about religion through study of the Bible for its literary and historic qualities, or of religion, when presented objectively as part of a secular program of education.

cy. A new and detailed policy was approved by the Board of Trustees.[7] The LCLU, contending that adoption of the new policy did not render moot the question of the prior practices and alleging that the adoption of the policy was no indication that the District would discontinue its former practices, proceeded to trial, requesting a declaratory judgment that the prior practices had been unconstitutional and injunctive relief to enjoin continuation of those practices.

The LCLU also challenged the new August, 1980 policy, particularly Paragraph 4 of the policy which states:

> The school board permits students to gather at the school with supervision either before or after regular hours on the same basis as other groups as determined by the school administration to meet for any educational, moral, religious or ethical purposes so long as attendance at such meetings is voluntary.

The LCLU claimed that this part of the newly devised policy was unconstitutional.

The case was tried to the court. There was abundant evidence to substantiate the LCLU claims of prior unconstitutional practices by the district. There was, however, less evidence introduced concerning the meaning and operation of the new policy, specifically Paragraph 4, adopted shortly before trial commenced.

The trial court determined at the close of evidence that the District practices cited above under both the unofficial policy prior to 1979 and the first written policy of January, 1979 infringed on the first amendment rights of students. The trial court, however, also determined that the newly adopted August, 1980 policy on religious practices was not facially unconstitutional. The court specifically noted that Paragraph 4 was not unconstitutional as it permitted student groups of all types to gather at the school as long as attendance at meetings was voluntary. According to the court, there was undisputed testimony that there would be no extra expense accruing to the district resulting from the meetings before or after school, and in the event that such

---

7. The new policy stated:

Wishing not to infringe either upon the belief of any student in a Supreme Being or upon the right of any student not to believe, The School Board places in effect the following policies relating to religion in the schools which supercede the policy on religion adopted on January 25, 1979.

1. The School Board permits the teaching of religion when presented objectively as part of a secular program of education.

2. The School Board permits study of the Bible and other religious materials for their literary and historic qualities.

3. Other than as stated in Sections 1. and 2. above, the School Board does not permit prayer or reading passages from religious materials aloud or over the loudspeakers during class hours or at functions which students are required to attend.

a. Except as limited above, this policy permits any student to pray in the school silently or audibly when it is not disruptive.

b. School administrators may set aside a short period for silent thought or meditation by students during the school day.

c. This policy permits teachers to explain the background or significance of religious content and beliefs where appropriate to the subject matter they are teaching.

d. This policy permits both teachers and students to recognize, reiterate or read

aloud or over the loudspeakers historical documents or portions thereof or statements from recognized figures, even though such statements include personal religious beliefs.

4. The School Board permits students to gather at the school with supervision either before or after regular school hours on the same basis as other groups as determined by the school administration to meet for any educational, moral, religious or ethical purposes so long as attendance at such meetings is voluntary.

5. Religious literature other than necessary for classroom work shall not be disseminated during class hours but may be purchased, indexed, shelved and circulated as library material.

a. This policy permits one student to offer religious literature to another student on a private non-intrusive, non-disruptive basis.

b. This policy permits volunteer groups of students to disseminate religious literature on a non-disruptive basis to the members of the group.

c. This policy permits any teacher to use historical documents or patriotic materials in the classroom where appropriate to the subject matter being taught.

6. There shall be no religious tests required of applicants for employment.

an expense was incurred, the group using the facility would be required to pay.

Additionally, the trial court found that no injunctive relief was necessary to correct any past unconstitutional practices or to insure future adherence to the August, 1980 policy that it had determined to be constitutional. The court stated that the passage of the new policy effectively wiped out any threat of harm from past violations. Secondly, the court found that the district had acted in good faith in establishing the new policy and that there was no need to enjoin the district to affirmatively carry out this new policy.

Finally, the trial court held that the LCLU did not have standing to bring an action for actual damages and that only nominal damages would be awarded, finding no evidence of knowledgeable ill-will that would form a basis for exemplary or punitive damages. The court did award reasonable attorneys fees and costs to the LCLU.

The LCLU challenges that portion of the trial court's judgment wherein the court refused to declare Paragraph 4 unconstitutional. It also challenges the trial court's refusal to enjoin the District from continuing past practices and current unconstitutional practices under Paragraph 4. We address each argument in turn.

## II.   The Establishment Clause Violation.

### A.   Conceptual Framework For Analysis of an Establishment Clause Violation.

The first amendment which prohibits any law respecting an establishment of religion also prohibits laws which prevent the free exercise thereof. In the case before us, the LCLU contends the District has, through its adoption of Paragraph 4, violated the establishment clause. The District defends on the basis that its action simply conforms to the right of students to freely exercise their religion in a public forum. We are thus faced with the classic first amendment confrontation.

This scenario in the first amendment area is not new. The United States Supreme Court has many times been called upon to determine whether or not a particular practice or policy of the state violated the first amendment,[8] or whether the prohibition of a particular policy or practice was in fact a prohibition on an individual's free exercise of religion.[9] Many of these cases have arisen from policies or practices carried out by public schools or by state financed education agencies.[10] In its examination of claimed establishment clause violations or impermissible burdens on free exercise, the Court has articulated the concerns which underlie its first amendment decisions and has developed a methodology to determine whether an establishment clause violation exists. Although neither the Supreme Court nor the appellate courts have addressed precisely the question before us today, a review of the underlying concerns and application of the methodology established for examination of first amendment violations provide a conceptual framework in which we may examine the District's policy on supervised student religious meetings.

In the Supreme Court's first modern encounter with the establishment clause, the Court applied the first amendment to the states through the fourteenth amendment. *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Additionally, it set forth the guiding principle of religious neutrality which has changed little in first amendment jurisprudence:

The "establishment of religion" clause of the First Amendment means at least

---

8.   *See, e.g., McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (Sunday closing laws held constitutional in face of establishment clause attack).

9.   "Free exercise" cases include *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (requirement of eligibility for unemployment compensation of willingness to work on Saturday violated free exercise rights of those who were religiously opposed to work on Saturday, not Sunday).

10.   Cases relating to the public schools and thus particularly relevant to our discussion today are set forth at text, pp. 1043, 1044.

this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and State."

330 U.S. at 15–16, 67 S.Ct. at 511 (citation omitted).[11]

This concern for "religious neutrality" was, according to Justice Frankfurter, particularly important in the setting of the public school.

The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart. "The great American principle of eternal separation"—Elihu Root's phrase bears repetition—is one of the vital reliances of our Constitutional system for assuring unities among our people stronger than our diversities. It is the Court's duty to enforce this principle in its full integrity.

*Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948).

Moreover, as the Court of Appeals for the Second Circuit has stated:

Our nation's elementary and secondary schools play a unique role in transmitting basic and fundamental values to our youth. To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit. *See Roemer v. Board of Public Works* [426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179], *supra; Chess v. Widmar, supra,* 635 F.2d 1310; Tribe, *supra* § 14–5 at 825.

*Brandon v. Board of Education of Guilderland Central School District,* 635 F.2d 971, 978 (2nd Cir. 1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). *See also Widmar v. Vincent,* —— U.S. ——, —— n.13, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981).

As a result of this special concern for the religious neutrality of our educational system, many religious activities occurring in school facilities during school hours have been declared unconstitutional. *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting of Ten Commandments in Kentucky public schools unconstitutional); *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (daily reading of Bible verses and Lord's Prayer in public schools held unconstitutional); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (state composed and mandated prayer to be recited in public schools held unconstitutional); *McCollum v. Board of Education, supra* (religious instruction in public school facilities on school time at no cost to district held unconstitutional); *Karen B. v. Treen,* 653 F.2d 897 (5th Cir. 1981), *aff'd,* —— U.S. ——, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (statute authorizing voluntary student or teacher initiated prayer at the beginning of the school day unconsti-

11. See L. Tribe, *American Constitutional Law,* § 14–4 at 816–17 (1978); Note, Government Neutrality and Separation of Church and State: Tuition Tax Credits, 92 Harv.L.Rev. 696, 697–700 (1979).

tutional); *Brandon v. Board of Education of Guilderland Central School District, supra* (school's refusal to allow students to meet for prayer meetings before or after school not unconstitutional as violative of the free exercise clause).

However, in some cases, activity which arguably implicated the first amendment's prohibition of the establishment of religion has been upheld. *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (released time for public school students to attend religious classes off campus held constitutional); *Florey v. Sioux Falls School District,* 619 F.2d 1311 (8th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980) (upholding rules permitting public school Christmas observances with religious elements as promoting an articulated secular purpose).

■ Considering the concern for religious neutrality in the public school setting, the question becomes how to determine whether a school has impermissibly participated in an establishment of religion. While each policy or practice must be examined on its own facts, the Supreme Court has established a method of analysis to be used to answer the question. This analysis asks three questions: does the policy or practice have a secular (non-religious) purpose? Is the primary effect of the policy or practice one which neither advances nor inhibits religion? Does the policy or practice avoid an excessive entanglement with religion? *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). If the answer to *all three* questions is in the affirmative, the policy or practice does not impermissibly provide for an establishment of religion and is thus constitutional. Ideally, too, affirmative answers to the above questions will alleviate the special concern that the public schools, important as "the most pervasive means for promoting our common destiny," are being utilized to promote an establishment of religion.

**B. Application of the Analytical Framework to the Case Before Us.**

**1. Secular Purpose.**

■ The District states that the avowed purpose of Paragraph 4 is to "encourage the development of leadership, communicative skills, and social and cultural awareness by allowing the voluntary association of students for educational, moral, religious, or ethical purposes." This association, according to the District,

> would simply permit students to put their ideas and practices in competition with the ideas and practices of other groups, religious or secular, which would stimulate students' intellectual curiosity and enhance their educational experience.

At least one court has recognized that "[a] neutral policy granting all student groups, including religious organizations, access to school facilities reflects the secular, and clearly permissible purpose—the encouragement of extra-curricular activities." *Brandon v. Board of Education of Guilderland Central School District,* 635 F.2d at 978. If the policy before us was merely a neutral policy contained in a neutral section of the District rules and regulations, our examination might be less difficult. Paragraph 4 must, however, be analyzed in the context in which it is written. It appears in the middle of a policy concerned with religious activities in the schools. The preamble to the policy[12] is obviously concerned with religious beliefs and the place of *religion* in the public schools. The language of the paragraph itself, stating that students may gather "on the same basis as other groups" indicates that the *focus* of this paragraph is with students who wish to meet for educational, *religious,* moral and ethical purposes. Thus, it is conceivable that the "pre-eminent purpose," *Stone v. Graham,* 449 U.S. at 41, 101 S.Ct. at 194, for Paragraph 4 is to promote meetings of a religious nature.[13] However,

**12.** See note 7, *supra.*

**13.** Our review is made more difficult by the lack of data put before the trial court and thus

before this court on appeal as to the meaning and operation of Paragraph 4. A review of the policy on its face, however, is enough to convince us there was no "pre-eminent" secular

[e]ven if the avowed objective of the [District] is not itself strictly religious, it is sought to be achieved ... [by religious meetings]. The unmistakable message of the Supreme Court's teachings is that the State cannot employ a religious means to serve otherwise legitimate secular interests. *See Schempp,* 374 U.S. at 224 [83 S.Ct. at 1572].

*Karen B. v. Treen,* 653 F.2d at 901. Thus, the purpose of this policy, ostensibly devised to allow many groups to meet, is, when examined in the context of the total school policy, more clearly designed to allow the meetings of religious groups. The District's justification for the religious meetings, the development of leadership and communicative skills, cannot withstand scrutiny when those goals can be attained through non-religious student associations.

### 2. Primary Effect of the Policy.

The crucial inquiry in determining the primary effect of Paragraph 4 is not whether an incidental benefit [14] accrues to a religious institution as a consequence of the District's action, but whether Paragraph 4 advances religion. *See Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). The primary effect test necessarily inquires whether the consequence of the district's policy is to place its imprimatur upon religious activity.[15] *School Dis-*

purpose. *See Stone v. Graham,* 449 U.S. at 40, 101 S.Ct. at 193.

Additionally, while the District in its brief on appeal claims that the purpose of the policy was to enhance student leadership potential and provide for situations where students gather to discuss varying ideas, there was actually nothing in the record, such as testimony from school board members or school authorities, which would indicate a secular purpose. Although we recognize that a secular purpose which is simply stated by a challenged school district will not necessarily be sufficient to avoid conflict with the first amendment, *Stone v. Graham,* 449 U.S. at 40, 101 S.Ct. at 193, *Karen B. v. Treen,* 653 F.2d at 900, articulation of a secular purpose by one who participated in the decision making process leading to the adoption of the policy would be helpful for any trial or appellate review of the policy. Again, the record is sadly lacking.

*trict of Abington Township v. Schempp,* 374 U.S. at 216–19, 83 S.Ct. at 1568–69.

In the case before us, the articulated policy of allowing religious meetings at a time closely associated with the beginning or end of the school day implies recognition of religious activities and meetings as an integral part of the District's extracurricular program and carries with it an implicit approval by school officials of those programs. This, in combination with the impressionability of secondary and *primary* age school children and the possibility that they would misapprehend the involvement of the District in these meetings, renders the primary effect of the policy impermissible advancement of religion. We reiterate from *Brandon* :

Our nation's elementary and secondary schools play a unique role in transmitting basic and fundamental values to our youth. *To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit.* See *Roemer v. Board of Public Works, supra,* 426 U.S. at 750, 754 [96 S.Ct. 2337, 2346] (1976); *Abington, supra; Engel, supra; Tribe, supra* § 14–5 at 825.

*Brandon v. Board of Education of the Guilderland Central School District,* 635

**14.** The District argues that any benefit would accrue only incidentally. We find this argument in the context of what has been determined to be "incidental benefits" to be unpersuasive. An incidental benefit accrues only when the primary benefit is secular; for example, loan of textbooks by the state to a parochial school incidentally benefits religion in the context of a primary benefit of secular texts being used by all children. *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). The allowance of religious meetings by the District here can in no way be considered an incidental benefit to religion. The benefit here accrues to religion, not to permissible secular goals.

**15.** The District argues that no *particular* religion is advanced. That is not the question. The question is whether religion is advanced. *Everson v. Board of Education,* 330 U.S. at 15–16, 67 S.Ct. at 511.

F.2d at 978 (emphasis added). *See also, Widmar v. Vincent,* —— U.S. at —— n.13, 102 S.Ct. at 276 ("University students are, of course, young adults. They are less impressionable than younger students and should be able to appreciate that the university's policy is one of neutrality toward religion. *See Tilton v. Richardson,* 403 U.S. 672, 685–686, 1971 [91 S.Ct. 2091, 2099, 29 L.Ed.2d 790].").

In light of the District's desire to continue religious activities, evident from the August, 1980 policy, its argument that there is no imprimatur or implied approval by the District of voluntary meetings simply because the meetings take place after "regular hours" is belied by the context of its policy, which authorizes supervised student meetings at a time closely associated with the school day.

The District contends, however, that the critical factor in the determination of the primary effect of this policy is whether there is coercion inherent in the policy, i.e., whether students are forced, by peer pressure or otherwise, to attend the religious activity which violates their first amendment rights. The district claims that since there is no coercion in this case, the meetings being voluntary, Paragraph 4 does not advance religion. This contention finds no support in case law.

State and school officials point out that student participation in the daily prayer session is allowed to be wholly voluntary. This fact is not relevant to the Establishment Clause inquiry. As the Supreme Court said in *Engel,* "Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of students is voluntary can serve to free it from the limitations of the Establishment Clause ...." 370 U.S. at 430, 82 S.Ct. at 1266–67, 8 L.Ed.2d 607. The Court then reiterated this principle in *Schempp,* stating that the constitutional defect of the religious exercises involved was not "mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Estab-

lishment Clause." 374 U.S. at 224–25, 83 S.Ct. at 1573, 10 L.Ed.2d at 859. The result is the same even though Jefferson Parish students must affirmatively request to participate in the prayer observance, for an Establishment Clause violation does not depend upon the presence of actual governmental coercion. *See Schempp,* 374 U.S. at 223, 83 S.Ct. at 1572, 10 L.Ed.2d at 858; *Engel,* 370 U.S. at 430, 82 S.Ct. at 1267, 8 L.Ed.2d at 607.

*Karen B. v. Treen,* 653 F.2d at 902.

The District also places great emphasis on its contention that the meetings take place before or after "regular hours," and claims that meetings must take place before or after school buses run. This, claims the District, distinguishes the case from *Brandon* and *Karen B.* where activities were held after buses had arrived at school (*Brandon*) and after the school day had begun (*Karen B.*). The District claims that the compulsory education machinery is not involved; thus there is no advancement of religion. We find, however, that it is the Texas compulsory education machinery that draws the students to school and provides any audience at all for the religious activities, whether the buses have run or the school day has "officially" begun. The distinctions drawn by the District to support its claim of no advancement do not withstand scrutiny. Rather, the critical factors are the District's use of its compulsory education machinery, which provides students available to attend even voluntary meetings, and its implicit support and approval of the religious meetings. *See Brandon v. Board of Education of Guilderland Central School District,* 635 F.2d at 978.

An examination of Paragraph 4 in the context of the overall policy of which it is an integral part demonstrates that its authorization of voluntary meetings held before or after school (whether or not the buses have run) has the primary effect of advancing religion. As the Second Circuit stated in *Brandon*:

An adolescent may perceive "voluntary" school prayer in a different light if he

were to see the captain of the school's football team, the student body president, or the leading actress in a dramatic production participating in communal prayer meetings in the "captive audience" setting of a school. *O'Hair v. Andrus*, 613 F.2d 931, 936 (D.C.Cir.1979) (Leventhal, J.). Misconceptions over the appropriate roles of church and state learned during one's school years may never be corrected.

*Id.*

### 3. Entanglement With Religion.

"The entanglement analysis focuses on procedural questions. *Roemer v. Board of Public Works*, 426 U.S. at 755 [96 S.Ct. at 2349]," and, "if the state must engage in continuing administrative supervision of nonsecular activity church and state are excessively intertwined." *Brandon v. Board of Education of Guilderland Central School District*, 635 F.2d at 979. Here the District admitted, prior to trial, that, in compliance with Texas state law, it would exercise supervision over the students:[16]

> It has been the consistent policy of the Board of Trustees of Lubbock Independent School District in connection with their statutory responsibilities with regard to school properties *to furnish personnel of the school district* for protection of such properties. This is done whether the group is putting on a theatrical performance, a political debate or other activity for which the premises are let.
>
> Section 23.26 of the Texas Education Code expressly sets out that property of the district whether real or personal is vested in the trustees and it necessarily follows that the trustees are responsible for such property.

Trial Brief of District 3 (emphasis added).

This admitted supervision is precisely the type of entanglement struck down in *Brandon* and *Karen B.* as impermissible entanglement.

**16.** In its appellate brief, the District reversed its earlier pre-trial position, alleging, on appeal, that supervision would be accomplished by a non-school person acceptable to the District. We believe its first position to be more in keeping with the law and actual practice. Fur-

School officials in this case would be forced to monitor the activities of the "Students for Voluntary Prayer." . . . More importantly, surveillance will be required to guarantee that participation in the prayer meetings would always remain voluntary.[9]

While the outcome of the case was questionable even in 1965, the Supreme Court's adoption of the entanglement test in 1969, *Walz v. Tax Commission, supra*, 397 U.S. [664] at 674, 90 S.Ct. [1409] at 1414, [25 L.Ed.2d 697] seriously undercuts the holding. The faculty supervision authorized by the court's decision is indicative of continuing surveillance of the students' prayer sessions that would have been necessary to assure that no coercion resulted.

[9] In *Reed v. Van Hoven*, 237 F.Supp. 48 (W.D.Mich.1965), the court authorized a school to permit student-initiated voluntary prayer at the commencement of the school day. Teacher supervision was permitted to maintain order at the prayer sessions. The court suggested that no bell signifying the start of the prayer exercise would be rung and that there should be a general commingling of the entire student body on the way to class.

*Brandon v. Board of Education of Guilderland Central School District*, 635 F.2d at 979. *See Karen B. v. Treen*, 653 F.2d at 902.

Additionally, the District's position that no District funds are required or spent because of meetings held pursuant to the policy does not free it from entanglement. *See McCollum v. Board of Education*, 333 U.S. at 208, 68 S.Ct. at 464 (classes in religion held on school premises during school hours at no cost to district held unconstitutional). Here, the use of the District's facilities and its continuing supervision of the religious meetings create the entanglement which leads to an impermissible establishment of religion.

thermore, a non-school employee who must be approved by the District also indicates entanglement when accompanied by use of school facilities. *McCollum v. Board of Education*, 333 U.S. at 208, 68 S.Ct. at 464.

## C. Defenses Raised by the District.

The District argues that Paragraph 4 is necessary to avoid violation of the free exercise clause. This defense is insupportable in law and in fact.

■ Paragraph 4 is in no way mandated by the free exercise clause. A school is obligated to provide religious facilities only if its failure to do so would effectively foreclose a person's practice of religion. *See* L. Tribe, Constitutional Law, § 14–8 (1978). *See also Abington School District v. Schempp*, 374 U.S. at 223, 83 S.Ct. at 1572; *Brandon v. Board of Education of Guilderland Central School District*, 635 F.2d at 977. Here, there is no problem with students being foreclosed from practicing religion. The students attend school only several hours a day, five days a week, nine months during the year. The other hours are effectively open for their attendance at religious activities at places other than state supported schools.

The District also argues that the school is a public forum, relying on *Widmar v. Vincent, supra*,[17] maintaining that it created a public forum when it allowed many student groups to meet before or after school. This reliance is misplaced. The District's argument misapprehends the definition of public forum. The holding of student meetings at a *public* school does not turn that school into a public forum. *See Brandon v. Board of Education of Guilderland Central School District, supra; Widmar v. Vincent, supra*. This public forum argument was, in fact, explicitly rejected in *Brandon* :

> First, a high school is not a "public forum" where religious views can be freely aired. The expression of religious points of view, and even the performance of religious rituals, is permissible in parks and streets when subject to reasonable time, place, and manner regulations. *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *O'Hair v. Andrus, supra* [613 F.2d 931 (D.C.Cir.1979)]. The facili-

ties of a university have also been identified as a "public forum," where religious speech and association cannot be prohibited. *Chess v. Widmar, supra*, 635 F.2d 1310; *Keegan v. University of Delaware, supra* [*Keegan v. University of Delaware*, 349 A.2d 14 (Del.1975)]. A high school classroom, however, is different, *Chess v. Widmar, supra*, slip op. at 22–23. While students have First Amendment rights to political speech in public schools. *Tinker, supra*, [*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731] sensitive Establishment Clause considerations limit their right to air religious doctrines.

*Brandon v. Board of Education of Guilderland Central School District*, 635 F.2d at 980.

In summary, we find a difficult situation confronting this court, one which apparently has never been directly addressed by an appellate court before. We are faced with an explicit authorization of religious meetings contained in the context of a policy setting forth guidelines on religion in the school. Additionally, the school implicitly uses the compulsory education laws to provide the students and explicitly agrees to provide supervision for the meetings. Our examination of Paragraph 4 according to the purpose, effect and entanglement analysis articulated by the Supreme Court indicates that, as to all three questions, impermissible establishment of religion exists.

## III. Claims for Injunctive Relief.

■ The LCLU alleges that it was entitled to relief enjoining the District from what it claimed would be continuation of the practices declared unconstitutional as well as to the declaratory judgment that the practices prior to August 26, 1980 were unconstitutional, claiming that the District's past record of unconstitutional practices presented an imminent threat of future constitutional violations.

---

**17.** As the Supreme Court itself stated, while a university is a public forum, this is no indica-tion that a public school is. *Widmar v. Vincent*, —— U.S. at —— n.12, 102 S.Ct. at 275.

The standard to be applied by this court in reviewing a denial of an injunction is whether the trial court abused its discretion in the denial. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). We find no abuse of discretion here.

The LCLU alleges that because the District maintained its unconstitutional practices through the 1979–80 school year despite complaints of illegality, it is likely that future violations will occur; thus an injunction must issue. It argues that actions of the District have been taken in bad faith and that there is no real intent to enforce the new policy.

However, the trial court found, and the finding is not clearly erroneous, that the past practices it declared unconstitutional had ceased, that no complaints had been received about the new policy and that the school district would make a good faith effort to enforce this new, and in the trial court's view, constitutional policy. We will not replace our judgment for that of the trial court when, in this case, the trial court has been granted broad discretion, 345 U.S. at 633, 73 S.Ct. at 897, to make a decision based on its evaluation of the evidence.

Our refusal to reverse the trial court is further supported by Meltzer v. Board of Public Instruction of Orange County, Florida, 548 F.2d 559 (5th Cir. 1977), aff'd on rehearing, 577 F.2d 311 (1978), cert. denied, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979), in which this court refused to grant injunctive relief against discontinued unconstitutional practices of a school district. The trial court there was faced with a school district which had very reluctantly complied with constitutional standards. Id. at 562–65. The Meltzer court's reluctance to overturn the decision of the trial court denying injunctive relief, id. at 568, even in the face of a recalcitrant school district provides persuasive guidance for us. While we agree that the practices of the District prior to August, 1980 were clearly unconstitutional, we do not agree that the trial court's determination that the practices were not likely to continue and refusal of an injunction as to the practices were an abuse of discretion.

We affirm the judgment of the district court refusing to enter an injunction with respect to the practices in effect before August 26, 1980. We reverse the judgment of the district court insofar as it held that Paragraph 4 was constitutional. We remand to the district court for the entry of an award of appropriate attorneys fees to the LCLU for this appeal. The costs of this appeal will be borne by the District.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.