Alicia **RIVERA, parent and representative of Ricardo Chavira; Doug Taylor, parent and representative of Jeffrey Taylor; and Virginia Lagergren, parent and representative of Dawn Lagergren, Plaintiffs,**

v.

**EAST OTERO SCHOOL DISTRICT R–1, Defendant.**

Civ. A. No. 87–M–699.

United States District Court, D. Colorado.

Sept. 14, 1989.

Larry Crain and Lynn M. Watwood, Jr., The Rutherford Institute, Brentwood, Tenn., and Robert A. Lees, Lees & Bath, Denver, Colo., for plaintiffs.

Ralph N. Wadleigh, LaJunta, Colo., and Thomas N. Alfrey and B. Epstein, Hall & Evans, Denver, Colo., for defendant.

MEMORANDUM OPINION
AND ORDER

MATSCH, District Judge.

This is an action by parents and students at La Junta High School (LJHS), operated

by East Otero School District R–1 (the "District"), seeking relief from past and prospective application of an official policy concerning the distribution of literature in the District. The controversy arises from the efforts of the high school students to distribute to other students a free non-student newspaper called *Issues and Answers* published by Student Action for Christ, Inc., also known as The Caleb Campaign. Ricardo Chavira and Jeffrey Taylor were suspended for distributing that paper in violation of the subject policy. The complaint alleges that they and Dawn Lagergren desire to distribute the paper but are in apprehension of sanctions for violation of the policy.

The plaintiffs' claims include the contention that they are entitled to relief under 42 U.S.C. § 1983 because the defendant's policy violates the students' freedom of speech contrary to the constitutional limitations in the First Amendment made applicable to the defendant by the Fourteenth Amendment to the United States Constitution. The plaintiffs filed a motion for partial summary judgment declaring that the subject policy is unconstitutional on its face and as applied to the newspaper. The defendant has moved for summary judgment of dismissal of all of the plaintiffs' claims. It is clear from the briefs and extensive supporting materials that there are genuine issues of material fact prohibiting summary determination of the claims other than those asserted in the plaintiffs' motion for partial summary judgment. Accordingly, the questions now to be decided are whether the distribution of *Issues and Answers* by students to students in a non-disruptive manner comes within the protection of the First Amendment and whether the defendant's policy restricting distribution is in contravention of that constitutional limitation on governmental authority. At oral argument it was agreed that the copies of *Issues and Answers* submitted with the papers filed in support of the respective motions for summary judgment are representative of the newspaper. While the articles involve an array of subjects of interest to adolescents, it is fair to characterize their content as promoting non-denominational Christian principles. Plaintiffs are not, however, claiming any infringement of rights protected by the Free Exercise Clause of the First Amendment. *Issues and Answers* also has some political content.

The District adopted POLICY KJA on January 12, 1987. It reads as follows:

### DISTRIBUTION/POSTING OF PROMOTIONAL LITERATURE

Distribution of printed noncurricula materials in the East Otero School District shall be allowed subject to the procedures and regulations as herein stated unless the material is "unacceptable" as hereinafter described.

The following shall be considered "unacceptable" material:

1. So-called "hate" literature that scurriously [sic] attacks ethnic, religious or any racial group.

2. Material that promotes hostility, disorder or violence.

3. Material that proselytizes a particular religious or political belief.

4. Materials designed for commercial purposes—advertising a product or service for sale or rent.

5. Material that is libelous, invades the rights of others or inhibits the functioning of the school, or advocates inference [sic] with the rights of any individual or with the normal operation of the school.

6. Material which in any way promotes, favors or opposes the candidacy of any candidate for election, or the adoption of any bond issue proposal, or any public question submitted at any general, municipal or school election. The prohibition will not apply on any election day or special election when the school is being used as a polling place.

7. Material that is obscene or pornographic as defined by pervading community standards throughout the district.

This policy governs noncurricula material and is not intended and shall not be interpreted to interfere with the prerogative of teachers to supplement and enrich text and reference book materials used in their courses with materials which are timely and up to date. However, no teacher shall distribute noncurricula materials in his class which are not intended to supplement the course work of his class without complying with the procedures which follow.

The superintendent shall present to any person or persons wishing to distribute printed noncurricula materials a copy of this policy and the accompanying procedures.

In the case of any student or students, a violation of the terms and conditions hereof shall result in disciplinary proceedings in accordance with Board policy. In the event of any other person or persons, it shall be the policy of the Board of Education to proceed through the courts of law to obtain injunctive relief and damages, where applicable, for any unauthorized distributions of printed noncurricula materials.

Defendant's Exhibit B.

The implementation of that policy is governed by a regulation, KJA–R, which, in pertinent part, reads as follows:

*Approval*

Any group, organization, corporation, individual, club, society or association (hereinafter referred to as "person" or "persons") that wishes to distribute any printed noncurricula material in any public school in the East Otero School District shall submit the material to the superintendent of schools for approval a minimum of 48 hours prior to the proposed distribution. The superintendent shall approve distribution subject to the regulations which follow unless the superintendent determines that the material is "unacceptable" as defined in policy KJA*.

Defendant's Exhibit C.

That regulation provides for an appeal from denial of approval by the superintendent to the Board of Education and it includes time, place and manner restrictions which are not now challenged as unreasonable.

The defendant contends that the plaintiffs' First Amendment claim must be dismissed because LJHS is not a public forum. Accordingly, the restrictions of the policy do not involve any fundamental right and the court's inquiry is limited to whether the restrictions are reasonable. That analysis is fundamentally flawed because it ignores the holding in *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and it misreads *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) and *Bethel School Dist. v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

■ In the clearest possible language, the Supreme Court in *Tinker* recognized that students are protected by the Constitution in the school environment and that prohibitions of pure speech can be supported only when they are necessary to protect the work of the schools or the rights of other students. The most apt language in the Court's opinion is the following:

In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit, said, school officials cannot suppress "expressions of feelings with which they do not wish to contend."

*Burnside v. Byars,* [363 F.2d 744, 749 (5th Cir.1966)].

393 U.S. at 511, 89 S.Ct. at 739.

■ The holding in *Tinker* did not depend upon a finding that the school was a public forum. The Court did say that "[w]hen [a student] is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions...." 393 U.S. at 512–13, 89 S.Ct. at 740. Thus, whether or not a school campus is available as a public forum to others, it is clear that the students, who of course are required to be in school, have the protection of the First Amendment while they are lawfully in attendance.

■ This case is different from *Tinker* in that it involves distribution of printed matter rather than oral communication, but writing is pure speech. *See Texas v. Johnson,* — U.S. —, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989) ("The Government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word") (citations omitted). Peaceful distribution of literature is protected speech. *See United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (leafletting is protected speech); *Martin v. City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943) (free speech includes right to distribute literature) (citing *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938)).

In *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court approved the authority of a public school principal in limiting the content of a newspaper written and published as a part of the course work of a journalism class. The Court held that the newspaper was not a public forum because it was part of the educational curriculum and a regular classroom activity. Writing for the Court, Justice White made clear the distinction that is applicable in the present controversy:

The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

108 S.Ct. at 569–70.

That same distinction makes this case different from *Bethel School Dist. v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), in which the Court ruled that a student was appropriately disciplined by the school authorities for the offensive tone of a nominating speech at a school assembly.

■ The defendant contends that Policy KJA's exclusion of "[m]aterial that proselytizes a particular religious or political belief" is necessary to prevent disruption and the appearance of political favoritism at the school. The issue of *disruptive conduct* by the students in past distributions of the newspaper is a matter of factual dispute which cannot be determined upon the present motions. It must be reserved for trial. The justification for this restriction based upon the fear of potential disturbance was dealt with directly and forcefully in *Tinker* where the Court said:

The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome

the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. *Burnside v. Byars,* [363 F.2d 744, 749 (5th Cir.1966)].

393 U.S. at 508–09, 89 S.Ct. at 737–38.

■ Political speech is protected by the First Amendment, *see, e.g., Bigelow v. Virginia,* 421 U.S. 809, 822, 95 S.Ct. 2222, 2232–33, 44 L.Ed.2d 600 (1975), as is religious speech. *Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981); *Marsh v. Alabama,* 326 U.S. 501, 504, 66 S.Ct. 276, 277–78, 90 L.Ed. 265 (1946). Advocacy and persuasive speech are included within the First Amendment guarantee if the speech is otherwise protected. *See NAACP v. Claiborne Hardware,* 458 U.S. 886, 910, 102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215 (1982); *Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1827–28, 60 L.Ed.2d 360 (1979) (per curiam); *Thomas v.*

*Collins,* 323 U.S. 516, 537, 65 S.Ct. 315, 326, 89 L.Ed. 430 (1945).

■ When a law infringes on protected speech, the proponent of the validity of the statute " 'bears the burden of establishing its constitutionality.' " *Wilson v. Stocker,* 819 F.2d 943, 949 (10th Cir.1987) (quoting *ACORN v. Municipality of Golden,* 744 F.2d 739, 746 (10th Cir.1984)). The government must show a compelling state interest to infringe protected speech and any infringement must be narrowly tailored to meet the compelling interest. *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980); *accord Grant v. Meyer,* 828 F.2d 1446, 1454–55 (10th Cir. 1987) (en banc), *aff'd,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); *Wilson v. Stocker,* 819 F.2d at 949.

■ The defendant argues that freedom for students to communicate with other students outside the classroom on religious and political subjects is incompatible with the mission of the school. That argument is patently frivolous. The District cannot completely muzzle the students to save itself the difficulty of determining which speech it may constitutionally proscribe. Most importantly, the mission of public education is preparation for citizenship. High school students, who at LJHS include persons of voting age, must develop the ability to understand and comment on the society in which they live and to develop their own sets of values and beliefs. A school policy completely preventing students from engaging other students in open discourse on issues they deem important cripples them as contributing citizens. Such restrictions do not advance any legitimate governmental interest. On the contrary, such inhibitions on individual development defeat the very purpose of public education in secondary schools. This court has previously commented extensively on that subject in *Cary v. Board of Ed. of Adams–Arapahoe School Dist. 28–J, Aurora, Colo.,* 427 F.Supp. 945 (D.Colo. 1977) (Matsch, J.), *aff'd,* 598 F.2d 535 (10th Cir.1979). The defendant's argument is perilously close to a claim that suppression

of lawful speech is legitimate when it is convenient. This defense is categorically rejected.

The defendant also asserts that the policy is justified by the compelling governmental interest in avoiding a violation of the First Amendment provision that "Congress shall make no law respecting an establishment of religion...." This prohibition applies to the states through the Due Process Clause of the Fourteenth Amendment. *Murdock v. Pennsylvania,* 319 U.S. 105, 108, 63 S.Ct. 870, 872, 87 L.Ed. 1292 (1943). The District contends that the restriction of material that proselytizes a particular religious belief is necessary to avoid a violation of the Establishment Clause.

The applicability of the defense must be tested in the context of distribution of *Issues and Answers* by students within the place, time and manner restrictions set forth in the regulations in KJAR. Thus, such distribution must be outside the classroom at times not considered disruptive of the normal school activities, without littering, by students with parental permission and without compelling or coercing acceptance of such material by other students.

The Establishment Clause is a limitation on the power of governments: it is not a restriction on the rights of individuals acting in their private lives. The threshold question in any Establishment Clause case is whether there is sufficient governmental action to invoke the prohibition. In *Bethel* and *Hazelwood,* the Supreme Court recognized a distinction between school-affiliated speech and the private speech of students. It is clear that the mere fact that student speech occurs on school property does not make it government supported. It is undisputed in this case that the students are not government actors, are not acting in concert with the government, and do not seek school cooperation or assistance with their speech. Accordingly, the Establishment Clause simply is not implicated.

The inapplicability of the Establishment Clause to the acts of private citizens is underscored by analysis of the Establishment Clause implications of a school policy

"permitting" students to exercise their constitutional right to engage in non-disruptive, lawful speech. The defendant recognizes the applicability of the three-part test created by *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971): "[f]irst, the [policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, ... finally, the [policy] must not foster 'an excessive government entanglement with religion.'" (citations omitted).

A policy of permitting students to speak to the full extent of their constitutional rights would have a secular purpose, because it would be done either out of respect for the student's rights, or for fear of lawsuits like this one.

A policy of not suppressing student speech would also neither advance nor inhibit religion within the meaning of the law. In *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987), the Supreme Court held that "[a] law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under *Lemon,* it must be fair to say that the *government itself* has advanced religion through its own activities and influence." (emphasis in original). By hypothesis, a governmental decision to remain uninvolved in religious matters cannot result in governmental advancement of religion.

Finally, as the Supreme Court observed in *Widmar v. Vincent,* 454 U.S. 263, 272 n. 11, 102 S.Ct. 269, 275 n. 11, 70 L.Ed.2d 440 (1981), permitting all lawful speech presents fewer entanglement risks than would be created by a policy of monitoring student speech, determining what was religious, and suppressing that speech. If the District's prohibition of student distribution of religious literature to other students, under the regulations of KJA–R, is compelled by the Constitution, the school administrators have an equal responsibility to restrict oral and symbolic communication of religious beliefs among pupils. Such a

policy would result in a hopeless entanglement in religious controversies. LJHS officials would have to establish procedures to determine whether students wearing a cross, a fish pin, or a star were sending religious messages. That involvement would be directly contrary to the constitutional command of governmental neutrality in religious matters.

■ Student religious activities violate the Establishment Clause when they are conducted in concert with school authority. The question is controlled by particular facts concerning the relationship. In *Bell v. Little Axe Independent School Dist.*, 766 F.2d 1391 (10th Cir.1985) the Tenth Circuit Court of Appeals affirmed the district court's determination that religiously oriented meetings of students and other persons in a public elementary school violated the Establishment Clause. The nominally student sponsored meetings were closely associated with the school administration. The court held that the school district's free speech justification for its open access policy was a sham when viewed in the context of the prior religious practices in the schools. In ruling that the facially-neutral policy had the primary effect of advancing religion, the appellate court found that elementary school children were vastly more impressionable than high school or university students and that the highly structured environment of the school furthered the appearance of school endorsement of the religious meetings. The excessive entanglement part of the *Bell* test was met by the requirement that the school monitored all student meetings. As the court noted:

> As permitted under the policy, the meetings were advertised in the school by posters with prominent religious indicia, and were held in school facilities under official supervision and responsibility. (citations omitted).

766 F.2d at 1406.

The *Bell* case is not controlling because of the factual differences. The court expressly distinguished between elementary schools and higher education, including high schools. 766 F.2d at 1404. The defendant contends that *Bell* precludes ruling for the plaintiffs on summary judgment because it requires consideration of the motivation behind the speech. In that regard, the District seeks to characterize the plaintiffs as zealots in a fundamentalist campaign. The defendant's position is incorrect. The Establishment Clause of the First Amendment is a limitation on governmental, not private action. Accordingly, the motivation of the plaintiffs is irrelevant. Here, the District has clearly disavowed any religious purpose in its restrictive policy and, therefore, there would no basis to suggest that permitting this type of private activity in the public school, with the accepted limitations, would be anything other than secular in purpose. Additionally, there is no requirement for any monitoring and there is no concerted activity.

In the *Bell* case, the Tenth Circuit cited *Lubbock Civil Liberties Union v. Lubbock Independent School Dist.*, 669 F.2d 1038 (5th Cir.1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983) and *Brandon v. Board of Ed.*, 635 F.2d 971 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). These cases, too, are readily distinguishable.

*Brandon*, like *Bell*, involved state action. The plaintiff students sought the use of a classroom before classes began for the day to conduct prayer meetings. 635 F.2d at 973. A school's decision to permit a group to use a classroom for a religious purpose suggests sponsorship. Here, there is no request for special access to school facilities. The plaintiffs ask only to be free to communicate in places available to all students during free time. Further, the court found that as a matter of state law, school personnel would be required to attend and monitor the meetings. 635 F.2d at 979. In this case, by contrast, because the students would be distributing newspapers in open areas, no additional monitoring or supervision is necessary.

In the *Lubbock* case, the defendant school district adopted a facially neutral policy allowing student meetings. 669 F.2d at 1041 & n. 7. However, it did so after its practices of distributing Bibles, conducting

silent prayers, and broadcasting Bible passages over the public address system were challenged. 669 F.2d at 1039–40. The court found that the purpose of the policy was to promote religious meetings, and that the primary effect of school endorsement of religious meetings would be to advance religion. 669 F.2d at 1044–45. The meetings in *Lubbock* did not constitute purely private action. No prior Establishment Clause violations taint the defendant District in this case.

▮ Because students have a right to engage in political and religious speech, and because the District has no compelling interest in restricting that speech, the ban on "[m]aterial that proselytizes a particular religious or political belief" is unlawful. This court finds that " 'every application of the [policy] create[s] an impermissible risk of suppression of ideas.' " *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (quoting *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798 n. 15, 104 S.Ct. 2118, 2125 n. 15, 80 L.Ed.2d 772 (1984)). That portion of Policy KJA is therefore void on its face. In theory religious or political speech could be substantially disruptive or obscene, but obscene materials and material promoting disorder and other unprotected speech are prohibited by other parts of Policy KJA. The sole purpose of this prohibition is to ban protected speech.

▮ This restriction is also facially invalid because it gives school officials unfettered discretion to apply it to whatever speech they choose, while failing to give students fair warning of what is prohibited. The Constitution requires a high degree of specificity when imposing restraints on speech. *See Hynes v. Mayor and Council of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) ("general test of vagueness applies with particular force in review of laws dealing with speech"); *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974); *see also Riseman v. School Comm.*, 439 F.2d 148, 149 (1st Cir.1971) (school prior restraint system too vague). This principle

has been most strictly applied in the area of prior restraints. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969). A "regulation imposing prior restraint must be much more precise than a regulation imposing post-publication sanctions." *Baughman v. Freienmuth*, 478 F.2d 1345, 1349 (4th Cir.1973) (high school case). *Accord Leibner v. Sharbaugh*, 429 F.Supp. 744, 748–49 (E.D.Va.1977). "[P]rior restraints must contain precise criteria sufficiently spelling out what is forbidden so that a reasonably intelligent student will know what he may write and what he may not write." *Baughman v. Freienmuth*, 478 F.2d at 1351. Because "religion" and "politics" are not self-defining terms, and under any definition are extremely broad concepts, school officials could interpret them to mean virtually whatever they wanted, while students are necessarily at a loss in attempting to determine what is prohibited. Every application of the policy creates an impermissible risk of suppression of ideas and it is facially invalid.

Additionally, this prohibition is overbroad and void on that ground. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917–18, 37 L.Ed.2d 830 (1973). When considered in the context of what is prohibited by other portions of Policy KJA, it is difficult to imagine any effect of this provision that would not be a limitation on protected speech. Courts routinely strike down school prohibitions on speech when there is no express requirement that the speech be disruptive, and hence unprotected under *Tinker*. *See Nitzberg v. Parks*, 525 F.2d 378, 383 (4th Cir.1975) (Clark, Justice); *Shanley v. Northeast Independent School Dist.*, 462 F.2d 960, 976 (5th Cir.1972); *Hernandez v. Hanson*, 430 F.Supp. 1154, 1163 (D.Neb.1977); *Cintron v. State Bd. of Ed.*, 384 F.Supp. 674, 679 (D.P.R.1974) (three-judge court).

Together, the prior approval requirement of KJA and KJA–R establish a content-based system of prior restraints. Prior restraints are disfavored. *See Heller v. New York*, 413 U.S. 483, 491, 93 S.Ct. 2789, 2794, 37 L.Ed.2d 745 (1973) (" 'Any system of prior restraints of expression comes to

this Court bearing a heavy presumption against its constitutional validity' ") (citing numerous cases); *accord Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539, 545, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976); *see also Bertot v. School Dist. No. 1*, 522 F.2d 1171, 1183 (10th Cir.1975) ("The [First] Amendment tolerates absolutely no prior restraints predicated on surmise or conjecture that untoward consequences may result").

Some courts have held that prior restraints on student distribution of literature are per se unconstitutional. *See Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988); *Fujishima v. Board of Ed.*, 460 F.2d 1355 (7th Cir.1972). Others have found prior restraint policies, if accompanied by specific standards and procedural safeguards, to be constitutional. *See Bystrom v. Fridley High School*, 822 F.2d 747 (8th Cir.1987); *Sullivan v. Houston Independent School Dist.*, 475 F.2d 1071 (5th Cir.), *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *Quarterman v. Byrd*, 453 F.2d 54 (4th Cir.1971). Assuming without deciding that prior restraints are not per se unconstitutional in high schools, this prior restraint system is facially invalid.

KJA–R incorporates one of the central evils of prior restraints: it gives the government the power to suppress speech in advance, while imposing no time limits or other procedural obligations on school officials that would ensure that speech is suppressed to the minimum extent possible, or that the speech is suppressed for good and expressed reasons, rather than at the whim of school officials. This policy gives school authorities the power to extinguish the right of students to speak through inaction and delay. In *Freedman v. Maryland*, 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965) the Supreme Court struck down a prior restraint because it failed to provide for a prompt determination. This policy is similarly defective. KJA–R provides for an initial review by the superintendent, but imposes no time limit on how quickly the superintendent must reply. Appeal may be had to the Board, but the Board, like the superintendent, may take as long as it likes to decide an appeal. Further, counsel for the defendant informed the court at oral argument that Board meetings are held every two months. Thus, a disappointed applicant would have to wait two months just to argue to the Board, with no guarantee that a decision would be had during that school year, or even during the continuation of the speaker's status as a student. Further, contrary to the constitutional presumption that speech is protected, the burden of proving that the speech is lawful is placed on the would-be speaker, rather than the censor. *See Freedman v. Maryland*, 380 U.S. at 58, 85 S.Ct. at 739.

Upon the foregoing, it is

ORDERED that the motion for summary judgment of the defendant East Otero School District is denied; and it is

FURTHER ORDERED that the motion for summary judgment of the plaintiffs is granted in part; and it is

FURTHER ORDERED that the part of Policy KJA which prohibits "Material that proselytizes a particular religious or political belief" is declared unconstitutional; and it is

FURTHER ORDERED that to the extent that Policy KJA and regulation KJA–R require prior approval for "Material that proselytizes a particular religious or political belief" the policy and regulation are declared unconstitutional.