**Fred CLEVER et al., Plaintiffs,**

v.

**CHERRY HILL TOWNSHIP BD. OF EDUCATION, Defendant.**

**Civ. No. 93–1012(JEI).**

United States District Court, D. New Jersey.

Dec. 2, 1993.

Tomar, Simonoff, Adourian & O'Brien by James Katz, Haddonfield, NJ, for plaintiffs.

Davis, Reberkenny & Abramowitz by Howard S. Mendelson, Cherry Hill, NJ, for defendant.

## OPINION

IRENAS, District Judge:

### I. *INTRODUCTION*

The Christmas season brings with it not only sidewalk Santas, mercantile mania, and endless reruns of *Its A Wonderful Life* and *Miracle on 34th Street,* but also a spate of constitutional litigation testing the limits to which governmental or public bodies may legally join in the festivities. In this case the plaintiffs challenge the policies of the Cherry Hill Board of Education in attempting to deal with issues which are both constitutionally abstruse and highly emotive.

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 and under the First and Fourteenth Amendments to the United States Constitution. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs also assert state law causes of action under Article I, ¶ 4 of the New Jersey Constitution and N.J.S.A. 18A:36–20 which are cognizable by this court pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a).[1]

This matter comes before the Court on cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. On November 24, 1993, this Court heard oral argument from the parties and reserved decision. For the

---

1. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ..." U.S. Const. amend. I.

The New Jersey Constitution of 1947 states in Art. I, ¶ 4: "There shall be no establishment of one religious sect in preference to another; no religious or racial test shall be required as a qualification for any office or public trust."

N.J.S.A. 18A:36–20 provides that:

No pupil in a public school in this State shall be discriminated against in admission to, or in obtaining any advantages, privileges or courses of study of the school by reason of race, color, creed, sex or national origin.

reasons set forth below, this Court will deny plaintiffs' motion for summary judgment and grant defendant's cross-motion.

## II. *BACKGROUND*

This case explores the constitutionally amorphous dividing line between the laudable educational goal of promoting a student's knowledge of and appreciation for this nation's cultural and religious diversity, and the impermissible endorsement of religion forbidden by the Establishment Clause of the United States and New Jersey constitutions.

Plaintiffs include Cherry Hill taxpayers, parents of students who attend Cherry Hill public schools and the American Civil Liberties Union of New Jersey ("ACLU"), some of whose members are either Cherry Hill taxpayers or public school parents.[2] They have challenged the constitutionality of Policy JO adopted by the Cherry Hill Board of Education to govern "THE USE OF CULTURAL, ETHNIC, OR RELIGIOUS THEMES IN OUR EDUCATIONAL PROGRAM." This one-page statement is supplemented by an additional three-page document known as "Administrative Procedure C–17" and by two pages of "Guidelines For the Implementation of Policy JO and Administrative Procedure C–17." Copies of Policy JO, C–17 and the Guidelines are attached to this opinion as Exhibits A through C.

All parties agree that the present student population of the Cherry Hill school district is both culturally and religiously diverse, although it is not disputed that the majority of the students are Christian and caucasian.

Policy JO opens with the statement that it is the responsibility of the schools to "foster mutual understanding and respect for the rights of all individuals regarding their beliefs, values, and customs." It goes on to provide that instructional programs must be conducted

with sensitivity to the many religious beliefs existing within our student population ... [and] must remain consistent with the law as interpreted by state and federal courts in accordance with the Constitution of the United States. Programs which teach about religion and its role in the social and historical development of civilization and in the social and political context of world events do not violate the religious neutrality of public schools. Schools may teach about but not promote religion.

There is a recognition in Policy JO of the "special significance of seasonal observances and religious holidays." It should come as no surprise that the nature and extent of the "seasonal observances" contemplated by Cherry Hill for the Christmas and Chanukah holidays are at the legal and emotional heart of this litigation.

Policy JO anticipates three types of public displays which might include religious symbols, only two of which are challenged in this litigation. Plaintiffs do not object to the display of religious symbols which are part of a "planned program of instruction."[3]

What plaintiffs do challenge are (i) calendars which are to be maintained in each classroom and in one central location, Administrative Procedure C–17, ¶ 4, and (ii) a display dealing with "cultural, ethnic, and religious customs and traditions of others during the appropriate season." Administrative Procedure C–17, ¶ 5. Although Christmas is not mentioned in connection with this dis-

---

2. Fred Clever is a resident, property owner and taxpayer of the Cherry Hill township. Estelle and Melvin Lerner are residents and taxpayers whose seven-year-old son, Joseph, attends the Thomas Paine Elementary School. The Does and the Roes are unidentified Cherry Hill taxpayers with children attending the public schools. They have requested anonymity for fear of "annoyance, embarrassment, harassment and retaliation" if their identities were known. Nothing in this opinion should be construed as approving the standing of anonymous litigants, a practice which should be countenanced in only the rarest of circumstances.

There is no dispute that at least some tax revenue is being expended by the Cherry Hill School Board to implement the policies which are challenged in this law suit.

3. Paragraph 3 of Administrative Procedure C–17 provides that such displays must demonstrate the holiday's cultural, ethnic, or religious significance, must be pictorial in nature or created by the students, and must remain on display only during the timeframe that corresponds to the unit being taught.

play, there is little doubt as to which "appropriate season" the drafters of this provision had in mind.[4]

The use of classroom and central calendars is mandated in the elementary and junior schools and optional in high schools at the discretion of the principal. Seasonal displays are permissible, but not required, in any particular school.

The calendars recognize a large variety of national, cultural, ethnic, and religious holidays[5] which are taken from a "district-approved list which is created in accordance with educational criteria, and which reflects the world's multi-cultural diversity." Administrative Procedure C-17, ¶ 4.[6] In some instances the holiday is marked not only by words, but also by a symbol which, if the holiday is a religious one, may have religious significance. However, any such symbol is confined to the square representing the date of the holiday. A copy of symbols approved for use in connection with the implementation of Policy JO are attached to this opinion as Exhibit D.[7]

Cherry Hill's policy also mandates that the calendars be used in conjunction with a list of books and other resource materials available in the school library relating to the holidays identified in the calendar. Teachers are provided with descriptions of each holiday to "be utilized by staff members as an educational resource throughout the school year. *Id.*

In addition to recognizing Election Day, Veterans Day, Thanksgiving Day and American Education Week, the November calendar highlights the "Birthday of Baha'u'llah (Baha'i)" on the 12th, "Divali (Hindu)" on the next day, "Shichi-so-san Seven, Five, Three Festival (Japan)" two days later, and, finally, on November 29 "Nanak's Birthday (Sikh)" is recognized. Divali and Nanak's Birthday are also marked by what appear to be religious symbols.

December's calendar recognizes nine days of significance including, appropriately if not ironically, "Bill of Rights Day" on the 15th. "Bodhi Day Buddha's Enlightenment," "Chanukah" and "Christmas" celebrated on the 8th, 9th, and 25th, are represented by religious symbols: a representation of Buddha, a

---

4. An earlier version of the Board's holiday policy provided:

   [I]t shall be permissible to decorate one central school location with a Christmas tree, a Chanukah menorah, and a Kwanzaa candelabra for the last ten school days before the Winter Recess....

   ....

   During the month of December, this bulletin board shall be divided into three equal segments, representing Christmas, Chanukah and Kwanzaa respectively. Symbols acceptable for each segment include the Chanukah menorah, dreidl, Nativity scene, Christmas tree, Kwanzaa candelabra and African–American art. All Symbols on this bulletin board shall be pictorial and shall be accompanied by the written explanation of their significance.

   Pl.'s Ex. N at 3, ¶¶ 1, 3.

5. We use the word "holiday" loosely to include days or weeks which are given special recognition, such as December 15, which is "Bill of Rights Day."

6. The list of holidays or other special dates or events given special mention in the calendars is collected from a wide variety of resource materials which are listed in Plaintiffs' Exhibit Y.

7. In response to an inquiry from the attorney for plaintiffs Cherry Hill elaborated on the use of symbols:

A pictorial representation of a nativity, the Ten Commandments, a cross, a Star of David, a crescent, the Hindu OM symbol, Buddha, Confucius, and Jesus Christ would be acceptable illustrations for both the centrally located and the classroom calendars. These symbols meet our secular educational goal of advancing student knowledge about our cultural, ethnic, and religious diversity while utilizing religious symbolism that is only as extensive as necessary. This effort is further supported by brief descriptions of each holiday which will be posted next to the calendars. While a crucifix could be used in curricular instruction, we do not intend to use a crucifix as an illustration on the calendars. Our secular educational goal can be met through the use of other Christian symbols. Please be reminded that all illustrations must be small enough to fit within the square of the individual date on the calendar.

An overriding consideration is our desire to advance our secular educational goals while utilizing religious symbolism that is only as extensive as necessary. Accordingly, to use one example, a small picture of a nativity scene could be used on the calendar; a three dimensional nativity scene would not be approved for a school's central display.

Pl.'s Ex. V.

menorah, and a Nativity scene, respectively. The African festival of "Kwanzaa" is on December 26 and depicted with a kind of candelabra which looks much like a menorah. Copies of the calendar used by the Cherry Hill Schools in November and December, together with the district approved descriptions of the holidays and events recognized in those calendars, are annexed to this opinion as Exhibits E through G.[8]

We know less about the seasonal displays planned for a central location in each school because they did not exist at the time of argument in this case and will vary from school to school. In an admirable effort to parse First Amendment jurisprudence, Administrative Procedure C–17 tells us that:

> The decorations and symbols used in such a display shall be examples of the cultural, ethnic, and/or religious holiday(s) that fall within that month. The symbols used shall be displayed for a period not to exceed ten school days. Any religious symbol which may be used shall be displayed simultaneously with at least one other religious symbol and at least one cultural and/or ethnic symbol. Any such display shall be accompanied by a written explanation that describes the cultural, ethnic, or religious significance of the symbols used in the display. The primary purpose of all such displays shall be to promote the educational goal of advancing student knowledge about our cultural, ethnic, and religious heritage and diversity.

Whenever a display is going to include a religious symbol, all of its elements "shall be submitted to the Office of Deputy Superintendent for review and approval." Guidelines, ¶ 2B.

Paragraph 3 of the Guidelines also permits displays in "offices, lounges, media centers, etc." in the principal's discretion, provided that they conform to the same standards provided for the central display described above.

Parents who find a particular activity "objectionable on religious grounds" may ask that their child be excused and provided with an alternate activity. Administrative Procedure C–17, ¶ 7. Since this case is concerned with public displays in the classroom and in central areas of the school, where a student's right to be "excused" is simply not meaningful, we will proceed on the assumption that few if any students would request such an excuse. If the schools' policy with respect to the calendars and the central display are unconstitutional, this infirmity could not be cured by offering students the impractical, and possibly traumatic, alternative of absenting themselves from school activities.

The Cherry Hill School Board's previous administrative policy ("APS–3") dealing with seasonal observances was enacted on November 19, 1970, and it did not delineate any specific criteria for acceptable displays and activities, and left the matter largely to the discretion of the school's principal. Def.'s Ex. A. APS–3 remained in existence until December, 1992. In October, 1993, the Cherry Hill school board adopted and enacted in its final form the policy at issue in this litigation. POLICY JO and APC–17.

In December, 1991, school officials removed a Nativity display from the bulletin board at the Stockton Street Elementary School. Community response to this action was intense, and the Cherry Hill School Board soon formed a Seasonal Observance Committee comprised of school administrators and teachers to study the issue and solicit input from the public. Cost's Dep. T 39, 15–21. The policies attacked in this law suit are an outgrowth of the work of that committee.

Plaintiffs contend that no other local school district in New Jersey permits the display of religious symbols and has provided the court with several policies of area school boards supporting their claims. Pl.'s Ex. CC. While we doubt that the practices of other public schools have much relevance to the

---

**8.** The originals of the calendars attached to this opinion are 16½″ by 11″ in size with each date being enclosed in a rectangle 1½″ by 2½″. Identical calendars are used in all Cherry Hill class-rooms. Individual schools are given discretion as to which if any of the symbols will be used in the larger calendar maintained at a central location in the school. Pl.'s Ex. U.

constitutionality of Cherry Hill's practices,[9] we note that the school board has submitted rebuttal evidence that other local school districts have policies which expressly permit the posting of religious symbols. Cost's Aff. in Opp. to Pls' Motion for Summ. Judgment, Ex. A.

### III. STANDING AND RIPENESS

■ Before reaching the merits of this litigation, we must first decide whether the matter is justiciable. Defendants have challenged the standing of certain plaintiffs to be litigants to this suit and have questioned the ripeness of their constitutional claims. Defendant relies heavily on *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) for the proposition that a potential psychological injury or a generalized disagreement with the government's conduct is not enough to confer standing. In that case, the plaintiffs were denied standing to challenge the transfer of property by the United States Department of Health Education and Welfare to a religious school. The Court found the purported injury to be insufficient to confer standing because the "plaintiffs failed to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error ..." *Id.* at 485, 102 S.Ct. at 765 (emphasis in the original).

*Valley Forge* cited the fact pattern in *Abington School District v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963). *See Valley Forge,* 454 U.S. at 486 n. 22, 102 S.Ct. at 766. *Schempp* involved a school district which began each day with a bible reading. Plaintiffs, whose children attended the defendant's school and objected to the reading, were held to have standing to challenge the practice.

In this case Cherry Hill has already begun implementing Policy JO and religious symbols appear on the calendars for November and December. The plaintiffs here are alleging very much the same interests as the plaintiffs in *Schempp.* Indeed, it is hard to imagine anyone with more interest than the parents of school children in the constitutionality of activities in the schools which their children attend.

■ Fred Clever also has standing as a resident, property owner, and taxpayer of Cherry Hill township to challenge the disbursement of public funds purportedly made in violation of the Establishment Clause. *Gilfillan v. City of Philadelphia,* 637 F.2d 924, 927 n. 1 (3d Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981) (citing *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)).

■ Defendants' second theory of non-justiciability is that the plaintiffs' claims are not ripe for adjudication. Federal jurisdiction is presumed lacking unless "the complainant clearly ... allege[s] facts demonstrating that he is the proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Presbytery of New Jersey v. Florio,* 830 F.Supp. 241, 247 (D.N.J.1993) (quoting *Renne v. Geary,* 501 U.S. 312, ——, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991).

■ The ripeness doctrine seeks to prevent the courts "from entangling themselves in abstract disagreements." *Id.* (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). To discern whether a particular matter is ripe, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515.

As noted above, the school policy concerning the use of religious symbols on school calendars has already been implemented. There is evidence in the record which indicates that religious symbols will be a part of the imminent holiday display, even though we do not yet know the content of the various displays which will appear in each school in the district. Moreover, since plaintiffs

---

**9.** It is predictable that Establishment Clause litigation will be fought out in the gray area between the acceptable and the impermissible. One of the risks a plaintiff takes in choosing to do battle in this constitutional fog is to create judicial sanction for a hitherto suspect activity and thus abet the spread of the very practice sought to be enjoined.

argue that Policy JO is "facially" unconstitutional, the undisputed actions taken by Cherry Hill to implement the policy make it ripe for adjudication on the merits.

## IV. STANDARD FOR SUMMARY JUDGMENT

The standard for granting a motion for summary judgment under Fed.R.Civ.P. Rule 56 is demanding and stringent. *Wilson v. Sullivan*, 709 F.Supp. 1351 (D.N.J.1989). Under Fed.R.Civ.P. Rule 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

At the summary judgment stage, it is not the role of the judge to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict for that party. *Id.*

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. Finally, summary judgment should be granted unless a dispute over a material fact is genuine, which the Court has defined as such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

A careful review of the record does not reveal any disputes as to material facts which would make it improper for this court to rule on the cross motions for summary judgment.

## V. ESTABLISHMENT CLAUSE

Although the Supreme Court has been called upon many times to interpret the scope and breadth of the Establishment Clause, it is somewhat surprising that it has never directly addressed the use of religious symbols in connection with a school's Christmas celebrations. The constitutional propriety of religious displays on government property, such as a Nativity scene, have reached the highest court in two fractured and contentious decisions which leave district court judges, if not local school board officials, in a Serbonian Bog.[10] *Compare Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1983) (holding that display of creche is not an Establishment Clause violation.) *with County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (declaring that display of creche is an Establishment Clause violation.).

The Supreme Court has articulated a three-part test which must be applied to determine whether a particular action violates the Establishment Clause: "[f]irst, the [policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [policy] must not foster an excessive entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). If the practice violates any one of the three tests, it must be struck down as violative of the First Amendment. *Stone v. Graham*, 449 U.S. 39, 40–41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980).

Although the *Lemon* test has been subjected to extensive criticism,[11] it still remains the

**10.** John Milton, *Paradise Lost*, Bk. II, lines 591–94; *see also* Eugene M. Haring, "Drug Abuse and Accidental Death Benefits: Hard Drugs and Hard Cases," 8 FORUM 45 n. 17 (1972).

**11.** *See, e.g., Lamb's Chapel v. Center Moriches School Dist.*, — U.S. —, — – —, 113 S.Ct. 2141, 2149–50, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring) ("Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys of Center Moriches Union Free School District."); *Lee v. Weisman*, — U.S. —, —, 112 S.Ct. 2649, 2685 (Scalia, J., dissenting).

dispositive analytical framework for deciding Establishment Clause cases. *Lamb's Chapel v. Center Moriches School Dist.*, —— U.S. ——, ——, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993); *Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (declining invitation to reconsider *Lemon*). However, before applying *Lemon* to the facts of this case, we must consider several other threads of Establishment Clause jurisprudence.

### (A) *Children*

The Supreme Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.... Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the students and his or her family. Students are impressionable and their attendance is involuntary.

*Edwards v. Aguillard*, 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); *See also Lee*, —— U.S. at ——, 112 S.Ct. at 2658.

### (B) *Context*

■ "Every government practice [is] judged in its *unique circumstances* to determine whether it constitutes an endorsement or disapproval of religion." *Lynch v. Donnelly*, 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring) (emphasis in the original). The context in which a symbol appears is critical because it may determine what viewers fairly understand to be the purpose of the display, and may negate any message of endorsement that the religious symbol might otherwise evoke. *County of Allegheny*, 492 U.S. at 573, 109 S.Ct. at 3086.

### (C) *Permanence*

■ A school's permanent display of religious symbols is constitutionally suspect. The "pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature ... and no legislative recitation of a supposed secular purpose

can blind us to that fact." *Stone*, 449 U.S. at 41, 101 S.Ct. at 194. *See also Washegesic v. Bloomingdale Public Schools*, 813 F.Supp. 559 (W.D.Mich.1993) (holding unconstitutional portrait of Jesus Christ outside of principal's office); *Joki v. Board of Educ. of the Schuylerville Central School Dist.*, 745 F.Supp. 823 (N.D.N.Y.1990) (finding violative of First Amendment crucifixion mural outside of high school auditorium).

### (D) *Passive v. Active*

■ Prayers, bible readings, or moments of silence which are mandated or directed by public school officials are constitutionally suspect. As held by the majority in *Lee*, prayer is an "overt religious exercise" in which students cannot be forced to participate. —— U.S. at ——, 112 S.Ct. at 2656. The less coercive effect of symbols when compared to compulsory participation in a religious exercise has been recognized by the Supreme Court: "forbid[ding] the use of ... one passive symbol—the creche—at the very time people are taking note of the season with Christmas hymns and carols in public schools ... would be a stilted overreaction...." *Lynch*, 465 U.S. at 686, 104 S.Ct. at 1365.

### (E) *Religious/Secular Holidays*

The Supreme Court has recognized that religious holidays may evolve and acquire significant secular meaning. *Lynch* 465 U.S. at 675–76, 104 S.Ct. at 1360 (detailing history of religious holidays which government may permissibly recognize). As noted in *County of Allegheny*, "[j]ust as some Americans celebrate Christmas without regard to its religious significance, some nonreligious American Jews celebrate Chanukah as an expression of ethnic identity and as a cultural or national event, rather than as a specifically religious event." 492 U.S. at 585, 109 S.Ct. at 3096.

### (F) *Denominational Preference*

■ Although the Establishment Clause has long been interpreted to prohibit government from promoting religion generally, *see, e.g., Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 210–11, 68 S.Ct. 461, 464–65, 92 L.Ed. 649 (1948); *Abington*

*School District*, 374 U.S. at 217, 83 S.Ct. at 1568, the Court has "expressly required 'strict scrutiny' of practices suggesting a 'denominational preference.'" *County of Allegheny*, 492 U.S. at 608–09, 109 S.Ct. at 3109. However, in the absence of demonstrating governmental endorsement of a particular set of religious beliefs, the display of religious symbols on government property in connection with a legitimate secular purpose, i.e., the celebration of Christmas, does not compel the conclusion that religion, generally, is being favored over non-religion. "Rather, it simply permits the government to acknowledge the holiday without expressing an allegiance to [religious] beliefs, an allegiance that would truly favor [religion] over non-[religion]." *Id.* at 611–612, 109 S.Ct. at 3111.

### (G) *No Hostility*

█ Establishment Clause jurisprudence expressly forbids hostility towards religion. *Lynch*, 465 U.S. at 673, 104 S.Ct. at 1359 (citing *Zorach v. Clauson*, 343 U.S. 306, 314–15, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)); *McCollum*, 333 U.S. at 211, 68 S.Ct. at 465. "A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution." *Lee*, —— U.S. at ——, 112 S.Ct. at 2661.

### VI. *APPLYING LEMON*

█ With these fundamental principles of Establishment Clause jurisprudence as our guide, we now turn to applying the tripartite test of *Lemon v. Kurtzman* to Policy JO as adopted and, to the extent known, implemented by the Cherry Hill School Board.

### (A) *Secular purpose*

█ To determine whether a policy or practice violates the Establishment Clause, we must carefully examine the history and content of the challenged policy to discern if its design is to "endorse or disapprove of religion." *Edwards*, 482 U.S. at 585, 107 S.Ct. at 2578. If the practice or policy does not have genuine and demonstrable secular purposes, it must be struck down. *Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111.

Plaintiffs' brief cites cases in which courts have struck down displays of religious symbols or compulsory religious observances in public schools. *Lee*, —— U.S. at ——, 112 S.Ct. 2649 (holding unconstitutional school prayer at high school graduation); *Stone*, 449 U.S. 39, 101 S.Ct. 192 (1980) (declaring unconstitutional display of Ten Commandments); *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (striking down as violative of First Amendment daily moment of silence for prayer in classrooms); *Lubbock Civil Liberties Union v. Lubbock Independent School Dist.*, 669 F.2d 1038 (5th Cir.1982) (setting aside as unconstitutional morning bible readings over school's public address system); *Washegesic v. Bloomingdale Public Schools*, 813 F.Supp. 559 (W.D.Mich.1993) (finding display of Jesus Christ's portrait violative of Establishment Clause); and *Joki*, 745 F.Supp. 823 (N.D.N.Y.1990) (holding unconstitutional crucifixion scene mural outside of high school auditorium).

All of these cases deal either with (i) government mandated or coerced participation in religious exercises or (ii) conduct, with no secular purpose, perceived as endorsing a particular religion or religion generally. These cases are generally discussed *supra*, in parts V.(C), (D) and (F).

Defendants principally rely on *Florey v. Sioux Falls School Dist.*, 619 F.2d 1311 (8th Cir.), *cert. denied*, 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980), which rebuffed a facial attack on a policy not dissimilar to Policy JO.[12] Although the Sioux Falls policy purported to cover all holidays, as in Cherry

---

12. The policy under attack in the *Florey* decision stated in relevant part, the following:

> 4. The use of religious symbols such as a cross, menorah, crescent, Star of David, creche, symbols of Native American religions or other symbols that are part of a religious holiday is permitted as a teaching aid or re-

source provided such symbols are displayed as an example of the cultural and religious heritage of the holiday and are temporary in nature. Among these holidays are included Christmas, Easter, Passover, Hanukkah, St. Valentine's Day, St. Patrick's Day, Thanksgiving Day and Halloween.

*Florey*, 619 F.2d at 1320.

Hill, there was little doubt that activities surrounding the Christmas holidays motivated the adoption of the policy. While it is a bit difficult to get the exact flavor of what went on in each Sioux Falls classroom, it is absolutely clear that students were exposed to religious symbols both visually and aurally, by the singing of Christmas carols.

In upholding the Sioux Falls policy, the *Florey* majority held:

> Only holidays with both religious and secular bases may be observed; music, art, literature and drama may be included in the curriculum only if presented in a prudent and objective manner and only as a part of the cultural and religious heritage of the holiday; and religious symbols may be used only as a teaching aid or resource and only if they are displayed as a part of the cultural and religious heritage of the holiday and are temporary in nature. Since ... the materials must be presented in a prudent and objective manner and symbols used as a teaching aid, the advancement of a 'secular program of education,' and not of religion, is the primary effect of the rules.

*Id.* at 1317.

We find that the use of religious symbols in a manner consistent with the expressed intent and direction of Policy JO has a genuine and demonstrable secular purpose.

As noted in V.(E), *supra*, Christmas and Chanukah are celebrated as cultural and national holidays as well as religious ones, and there is simply no constitutional doctrine which would forbid school children from sharing in that celebration, provided that these celebrations do not constitute an unconstitutional endorsement of religion and are consistent with a school's secular educational mission. Indeed, the Supreme Court in *Lynch* referred to "the very time people are taking note of the season with Christmas hymns and carols in public schools...." 465 U.S. at 686, 104 S.Ct. at 1365.

Religion is a pervasive and enduring human phenomenon which is an appropriate, if not desirable, subject of secular study. It is hard to imagine how such study can be undertaken without exposing students to the religious doctrines and symbols of others. Plaintiffs protest that the calendars and central displays are not part of "a planned program of instruction," but the use of appropriate classroom and central displays is clearly a recognized and legitimate educational technique. If displays are perceived by plaintiffs as capable of conveying unwanted religious messages to the student viewers, surely such displays are capable of having secular educational impact.

Policy JO starts by observing that it is the responsibility of educators to "foster mutual understanding and respect for the rights of all individuals regarding their beliefs, values, and customs." In a nation as diverse as America, it is impossible to overestimate the secular importance of teaching this lesson. We learn this lesson not by being offended or threatened by the religious symbols of others, but by understanding the meaning of those symbols and why they have the capacity to inspire intense emotions. If our public schools cannot teach this mutual understanding and respect, it is hard to envision another societal institution that could do the job effectively. In a palpable and real way, the calendars and related materials prepared in Cherry Hill to carry out Policy JO clearly emphasize both tolerance and diversity.

The implementation of Policy JO involves no permanent displays of religious symbols [13] and involves no forced participation in a rite or exercise which can be deemed primarily religious. Cases like *Stone*, *Lee*, *Washegesic* and *Joki* discussed in V.(C) and (D) *supra*, are clearly distinguishable.

*County of Allegheny* and *Lynch* clearly indicate that whether the use of religious symbols can be deemed secular depends on the context in which they are used. *Lee* and *Edwards* effectively mandate that, when school children are involved, the standard used to evaluate the risk that viewers of a

---

**13.** The calendars, of course, change monthly, and ¶ 5 of Administrative Procedure C–17 limits the duration of any central display using religious symbols to ten days and permits their use only during an appropriate season.

religious symbol might infer governmental endorsement of religion must be more rigorous than that used to validate the public display of a creche in *Lynch*. Cherry Hill has met that burden. The limitation of symbols to a small box in a calendar, the accompanying explanatory material and the limitations imposed on the use of a crucifix or a three-dimensional Nativity scene are examples of the sensitivity shown by the school board in emphasizing the secular and educational context of their displays.

We are aware that Policy JO leaves a great deal of latitude in its implementation, particularly with respect to as yet unknown central displays for the impending holiday season. One could, in theory, envision a display which, in context, could be perceived as impermissibly endorsing religion. However, there is nothing facially in Policy JO which would negate a genuine secular intent. "Sufficient unto the day is the evil thereof." [14]

### (B) *Primary effect*

■ The second prong of the *Lemon* test requires us to discern whether the "primary effect [is] one that neither advances nor inhibits religion." 403 U.S. at 612, 91 S.Ct. at 2111. A religious display's constitutionality depends on whether a reasonable observer, considering the context in which it is presented, would likely perceive it as a governmental imprimatur to religion. *County of Allegheny*, 492 U.S. at 595–96, 109 S.Ct. at 3102–03.

Given the emphasis Policy JO places on religious diversity, there is simply no basis for concluding that it endorses any particular religion. Nor can it be said to favor religion over non-religion. The language of the policy completely disclaims any such intent: "Schools may teach about but not promote religion." To the extent the record reflects the actual implementation of that policy, the calendars for November and December, which celebrate a wide variety of religious and secular holidays, confirm that its intent is being fairly implemented.

It often appears that litigation attacking the public use of religious symbols is motivated by feelings of discomfort or hostility experienced by one who is exposed to the symbol but does not share the particular faith which the symbol represents. To these feelings may be added the sense of exclusion sometimes felt by a non-Christian looking at a symbol which represents the religion of a great majority of Americans. One of the obvious purposes of Policy JO is to eradicate those feelings of hostility and discomfort and to allow students to share the knowledge of other religious heritages without feeling threatened by them.

■ It might be also note that a particular religious display is not rendered unconstitutional because it offends the sensibilities of some viewers. As Justice Kennedy noted in *Lee*, it would be difficult for any student attending classes or assemblies, or completing assignments, not to have been exposed "to ideas they find distasteful or immoral or absurd or all of these" or to "ideas deemed offensive and irreligious, ..." *Id.; see also Florey*, 619 F.2d at 1317 ("It would be literally impossible to develop a public school curriculum that did not in some way affect the religious or nonreligious sensibilities of some of the students or parents."). The "fundamental dynamic of the Constitution" does not rest on the varying sensibilities of students to the school's educational program. *Lee*, —— U.S. at ——, 112 S.Ct. at 2657.

■ Cases dealing with *Lemon*'s second prong generally focus on governmental conduct which is alleged to promote or foster religion. However, this prong also forbids governmental conduct whose primary effect is to inhibit religion. 403 U.S. at 612, 91 S.Ct. at 2111. Under normal circumstances the absence of religious displays is neutral and without First Amendment significance. However, in the context of the Christmas–Chanukah holidays, this absence might be less than neutral.

As our nation becomes overwhelmed with the tangible evidences of the year-end holiday spirit, the studied absence or even limitation of consistent celebrations within the school might well be interpreted by a student as governmental hostility to the celebrating religions. The fine points of Establishment

---

14. *Matthew* 6:34 (King James version).

Clause jurisprudence may be lost on a young student who sees Christmas and Chanukah everywhere but in her school. *Cf. Lee v. Weisman,* — U.S. at —, 112 S.Ct. at 2661 ("A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution."); *Lamb's Chapel,* — U.S. at —, 113 S.Ct. at 2147 (holding that refusal to rent school property to religious organization to exhibit film not "viewpoint neutral.").[15]

(C) *Excessive entanglement*

▇ The third and final element of the *Lemon* test demands that government policy not "foster an excessive ... entanglement with religion." 403 U.S. at 613, 91 S.Ct. at 2111. If the state must engage in continuing administrative supervision of religious activity, church and state are excessively intertwined. *Brandon v. Board of Ed. of Guilderland Central School,* 635 F.2d 971, 979 (2d Cir.1980). This analysis is particularly relevant when the state is involved in administering grants to parochial schools. *Aguilar v. Felton,* 473 U.S. 402, 413, 105 S.Ct. 3232, 3238, 87 L.Ed.2d 290 (1985); *Florey,* 619 F.2d at 1318.

Plaintiffs rely on an unreported Washington state court opinion which held that a school's pervasive monitoring of a religious symbol policy that permitted individual teachers to construct classroom displays with sectarian objects created excessive entanglement with religion. *Mainger v. Mukilteo School District,* No. 85–2–04671–2 at 7 (Su-

per.Ct.Wash., Nov. 7, 1986). Pl.'s Brief, Ex. A.[16]

As did *Florey,* we explicitly reject the "entanglement" challenge based on a school district's efforts to insure compliance with the Establishment Clause in the operation of its schools. This is "[the] type of decision inhere[nt] in every curriculum choice and would be faced by school administrators ... even if the rules did not exist." 619 F.2d at 1318. Given the uncertain state of Supreme Court guidance in this area, plaintiffs' argument might leave school administrators no choice but "to exclude religion from every aspect" of school life. *Lee,* — U.S. at —, 112 S.Ct. at 2661. There is no Supreme Court precedent which suggests this result.

Political divisiveness evoked by Policy JO is also raised by the plaintiffs as a basis for striking down the policy. *Lemon,* 403 U.S. at 622, 91 S.Ct. at 2115 (finding that aid to parochial schools would provoke political battles between those for and against such aid). Even if we were to assume that political divisiveness existed over the adoption of Policy JO, that alone would not be dispositive of the entanglement test. *Lynch v. Donnelly,* 465 U.S. at 684, 104 S.Ct. at 1365 (1983). Indeed, the *Lynch* court stated that if the facts at issue did not "involve a direct subsidy to religious schools or colleges ... no inquiry into political divisiveness is [warranted]." *Id.*[17]

VII. *CONCLUSION*

Because Policy JO facially, and to the extent implemented, has a genuine secular pur-

---

15. Plaintiffs correctly point out that ¶ 7 of Administrative Procedure C–17 which purports to permit students to "be excused from any activity the parents deem objectionable on religious grounds" will not salvage an otherwise unconstitutional practice. *Abington,* 374 U.S. at 224–25, 83 S.Ct. at 1572–73.

16. The policy at issue in *Mainger* was similar to Policy JO in that it permitted:

Displays of religious objects or symbols, if used, shall be displayed in conjunction with a variety of secular holiday symbols, so that the total presentation emphasizes the cultural and secular rather than the religious or sectarian significance of the holiday.

*Mainger,* at 7.

17. Defendant argues that deciding in plaintiffs' favor would necessarily abridge the Free Speech

rights of the students and staff in the school district. Peculiarly, defendant relies on equal access jurisprudence. *E.g., Lamb's Chapel v. Center Moriches School District,* — U.S. —, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Defendant contends that limiting religious displays in the manner suggested by plaintiffs would result in a content-based restriction on speech allowed within the schools. First Amendment jurisprudence is densely populated with cases that subordinate free speech rights to Establishment Clause concerns. *See, e.g., Berger v. Rensselaer Central School Corp.,* 982 F.2d 1160, 1168 (7th Cir.1993) (holding prohibition against distributing bibles in public schools does not violate school staff and students' Free Speech rights). This contention is meritless and requires no further discussion.

pose, does not impermissibly promote religion and does not unduly entangle the government in state-church relationships, there is no First Amendment violation. There being no viable federal claims, the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The court will enter an order granting defendant's cross-motion for summary judgment and denying the plaintiffs' motion.

## EXHIBIT A

### CHBE/NSBA File: JO

## BOARD OF EDUCATION

### Cherry Hill, New Jersey

Category J: Students

Policy JO: THE USE OF CULTURAL, ETHNIC, OR RELIGIOUS THEMES IN OUR EDUCATIONAL PROGRAM

We believe that it is our responsibility as educators to foster mutual understanding and respect for the rights of all individuals regarding their beliefs, values, and customs. In pursuing this goal the Board recognizes that we have a diverse community with a variety of cultural, ethnic, and religious backgrounds and we are cognizant of the special significance of seasonal observances and religious holidays.

The Board also recognizes that a genuine and broad secular program of education is furthered by advancement of students' knowledge about our society's cultural, ethnic and religious diversity. Inclusion of this area of knowledge helps to achieve our district's educational goals.

Through our instructional programs, we shall seek to broaden our students' understanding of, and respect for, the many beliefs and customs stemming from our diverse multicultural community's religious, racial, ethnic and cultural heritage. While one cannot study the richness of civilization without studying about religion, it is essential that those studies be conducted with sensitivity to the many religious beliefs existing within our student population; they must also remain consistent with law as interpreted by state and federal courts in accordance with the Constitution of the United States. Programs which teach about religion and its role in the social and historical development of civilization and in the social and political context of world events do not violate the religious neutrality of the public schools. Schools may teach about but not promote religion. The inclusion of religious themes in the study of the arts, literature, and history shall be only as extensive as necessary for a balanced and comprehensive study of these areas.

The district supports the inclusion of cultural, ethnic and religious literature, music, drama and the arts in the curriculum and in school activities, so long as such inclusion reinforces our secular educational goal of providing a valuable learning experience. A wide variety of activities shall be included throughout the year.

Staff members are responsible for creating the school atmosphere and for demonstrating interest, sensitivity and support, so that students may see that different customs and beliefs are wonderful and essential elements of a pluralistic society.

DOC: 1269

Second Reading October 18, 1993

## EXHIBIT B

C–17

## CHERRY HILL PUBLIC SCHOOLS ADMINISTRATIVE PROCEDURE

The Use of Cultural, Ethnic, or Religious Themes In our Educational Program

The guidelines below shall be followed in implementing formal curriculum and in providing information on holidays which have cultural, ethnic or religious significance. The primary purpose of all material used to provide such information on holidays shall be to promote the educational goal of advancing student knowledge.

1. Sensitivity to the diverse cultural backgrounds represented in our society should be an important guideline in selecting instructional materials and resources and in presenting the instructional program.

2. An instructional unit including religious or cultural themes and/or material need not necessarily be confined to any specific holiday season, but may be presented at such time during the school year that is appropriate to the curriculum. Reading lists, resource materials and inservice training shall be provided to staff members, in order to effectively implement the educational goals of Policy JO—The Use of Cultural, Ethnic, or Religious Themes In our Educational Program. .

While assignments directing students to express their personal beliefs about their cultural, ethnic or religious backgrounds are not appropriate, individual student responses which may reflect such backgrounds and beliefs shall be accommodated and not result in embarrassment.

3. Within the classroom, displays of religious symbols are permissible provided such symbols are part of the planned program of instruction and comply with the three criteria below.

    a. are displayed as an educational example of the holiday's cultural, ethnic, and/or religious significance

    b. are pictorial in nature or are created by students,

    c. remain on display within a timeframe that corresponds to the unit being taught.

The primary purpose and effect of all such displays shall be to promote the educational goal of advancing student knowledge about our cultural, ethnic, and religious heritage and diversity; such displays shall not appear to promote or celebrate any single religion or religious holiday.

4. During the ten months of the school year one centrally located bulletin board in each elementary and junior school, and a calendar poster in each elementary school classroom, shall display a calendar on which the month's cultural, ethnic and religious holidays are listed. Holidays included shall be taken from a district-approved list which is created in accordance with educational criteria, and which reflects the world's multicultural diversity. Illustrations for each holiday listed shall be confined to the square representing its date.

A list of books and other resource materials on the holidays, which are available in the school library, shall be posted next to the calendar bulletin board display and made available in classrooms. Dates listed on the calendar, with the explanations provided by the district, shall be utilized by staff members as an educational resource throughout the school year.

Requests for changes in the list of dates used for the calendar may be made, either by staff members through the school principal, or by members of the public. Such requests shall be considered by the Deputy Superintendent and other staff members, using the criteria established for selection of the dates.

5. Since it is more meaningful for children to learn about and become aware of cultural, ethnic, and religious customs and traditions of others during the appropriate season, it shall be permissible to decorate one central school location with appropriate displays. The decorations and symbols used in such a display shall be examples of the cultural, ethnic, and/or religious holiday(s) that fall within that month. The symbols used shall be displayed for a period not to exceed ten school days. Any religious symbol which may be used shall be displayed simultaneously with at least one other religious symbol and at least one cultural and/or ethnic symbol. Any such display shall be accompanied by a written explanation that describes the cultural, ethnic, or religious significance of the symbols used in the display. The primary purpose of all such displays shall be to promote the educational goal of advancing student knowledge about our cultural, ethnic, and religious heritage and diversity.

Additionally, throughout the school year bulletin boards may be decorated with pictorial displays that recognize national and international holidays.

6. Any school musical program or concert composed of several choral and instrumental selections, shall have secular educational value and shall not be, nor have the effect of being, religiously oriented or a

religious celebration. While individual religious pieces of music may be performed for their musical value, the total effect of a music program or concert shall be non-religious.

7. The school shall honor written requests from parents/guardians that children be excused from any activity the parents deem objectionable on religious grounds, and will provide an alternative activity for any child so excused. Such activities shall be handled with sensitivity.

8. Any student, staff member, parent/guardian, or community member who believes that a particular school program, practice or employee may have violated or misapplied Policy JO may submit a written complaint to the superintendent, who will form a staff committee, which will include the building principal involved, to review the matter in question in a timely fashion.

ARC/ms

DOC:1269

## EXHIBIT C

## CHERRY HILL PUBLIC SCHOOLS

### Cherry Hill, New Jersey

Guidelines For the Implementation of Policy JO and Administrative Procedure C–17, The Use of Cultural, Ethnic, or Religious Themes In Our Educational Program

1. During the ten months of the school year one *centrally located bulletin board* in each elementary and junior school, and a calendar poster in each elementary school classroom shall display a calendar on which the month's cultural, ethnic, and religious holidays are listed (Administrative Procedure C–17, Item 4)

   A. Every holiday on the district list must be included on the centrally located calendar and on the smaller classroom calendar.

   B. A list of books and other resource materials on the holidays identified on the centrally located calendar and the classroom calendar shall be posted next to these calendars.

   C. The monthly list of dates sent out from Central Administration, which contains the holidays for the month and a brief description of each holiday is to be posted next to the centrally located calendar and the classroom calendar.

   D. If principals use religious symbols for the centrally located bulletin board other than those sent to them from Central Administration these symbols must first be reviewed and approved by Deputy Superintendent.

2. It shall be permissible to decorate *one central school location with appropriate and timely displays* throughout the year for a period of time not to exceed ten school days (Administrative Procedure C–17, Item 5).

   A. In a display recognizing a completely secular holiday (historical, cultural, ethnic, racial, national) any number of items may be included in the display.

   B. If any religious symbol is to be part of a display it must be displayed simultaneously with at least one other religious symbol of a different religion and at least one cultural and/or ethnic symbol. All elements of such displays referred to in this paragraph shall be submitted to the Office of Deputy Superintendent for review and approval.

   C. All displays must be accompanied by a written explanation that describes the cultural, ethnic, or religious significance of the symbols used. If the written explanation for a display is not provided by Central Administration the building principal must submit his/her proposed explanation to the office of the Deputy Superintendent for review and approval prior to the construction of the display.

   D. Keep in mind that the above guidelines refer to displays in a central location as identified in Item 5 of Administrative Procedure C–17. It is possible that there could be a display of religious symbols in a classroom or classrooms during the year *provided such displays are part of a planned program of instruction* and are in compliance with the three criteria listed under Item 3 of Administrative Procedure C–17. Such

displays, as part of planned instruction, reflect our cultural, ethnic, and religious diversity and advance student knowledge of this diversity.

E. On the high school level, a showcase display done by students in Marketing Education, for example, would be viewed as part of the instructional program. Such a display shall conform to A, B, and C above.

F. Be conscious of the relative size of the items used in any display.

G. Decorations on Christmas trees shall not include items such as angels or Jewish stars.

H. If a Christmas tree and a menorah are used in a display you may have lights on either or both of these symbols. For display purposes all lights on the menorah are to be turned on simultaneously; electric bulbs only. If candles are used decoratively as they are in a kinara, they are not to be lighted.

I. A Giving tree is acceptable in place of the traditional Christmas tree.

3. Displays in offices, lounges, media centers, etc. shall be permitted at the discretion of the building principal as long as all such displays conform to the above guidelines.

4. Throughout the school year bulletin boards may be decorated with pictorial displays that recognize national and international holidays. Other bulletin boards throughout the school may be decorated with appropriate seasonal displays (i.e., autumn leaves, turkeys, winter snow scenes, spring flowers, etc.)

5. If your School PTA/HSA has its own bulletin board which is used regularly for announcements, flyers, etc. they should be advised not to include religious symbols, but rather stick to secular symbols, as mentioned in # 4 above.

6. Principals are responsible for all displays and bulletin boards in their respective schools. While the school principal may elect to ask for student, teacher, or parent assistance in putting up a display, the principal must be aware of what the display will be before it goes up. When necessary prior approval must be obtained from the Deputy Superintendent as indicated in 2-B above.

ARC/ms

DOC1318

EXHIBIT D

- Buddhism
- Confucianism
- Christianity
- Jainism
- Hinduism
- Judaism
- Shinto
- Islam
- Sikhism
- Taoism
- Zoroastrianism

EXHIBIT E

# NOVEMBER '93

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | 1 | 2<br>Election Day | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11<br>Veterans Day | 12<br>Birthday of Baha'u'llah (Baha'i) | 13<br>Divali (Hindu) |
| 14<br>American Education Week Nov. 14-20 | 15<br>Shichi-so-san Seven, Five, Three Festival (Japan) | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25<br>Thanksgiving Day | 26 | 27 |
| 28 | 29<br>Nanak's Birthday (Sikh) | 30 | | | | |

EXHIBIT F

# DECEMBER '93

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | 1 | 2 | 3 | 4 |
| 5 <br> National Day (Thailand) | 6 | 7 | 8 <br> Bodhi Day Buddha's Enlightenment | 9 <br> Chanukah | 10 <br> Human Rights Day | 11 |
| 12 | 13 | 14 | 15 <br> Bill of Rights Day | 16 <br> Las Posadas | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 <br> Christmas |
| 26 <br> Kwanzaa (African-American) | 27 | 28 | 29 | 30 | 31 <br> New Year's Eve | |

EXHIBIT G

## In November ...

A special week in November is American Education Week, November 14–20. A highlight of American Education Week is National Community Education Day on Tuesday, November 16, celebrating partnerships between schools and their communities.

### November 2   Election Day (United States)

For many national, state and local elections, Election Day is held on the first Tuesday after the first Monday in November.

### November 11   Veterans Day (United States)

This national holiday now honors all who have served the nation in the armed services. It was originally called Armistice Day, commemorating the signing of the Armistice that ended World War I in 1918. By the terms of the Armistice, the fighting ended at 11:11 a.m. on November 11, the eleventh minute of the eleventh hour on the eleventh day of the eleventh month.

### November 12   Birthday of Baha'u'llah (Baha'i)

This date marks the birthday of the prophet-founder of the Baha'i faith. Baha'u'llah (1817–1892) was a member of one of the great aristocratic families of Persia who gave up his wealth and position to preach to people about the unification of all humanity and the coming of a world civilization.

### November 13   Divali (Hindu)

Divali, one of the most important festivals of the year for Hindus, is a new year festival, celebrated in the Hindu month of Kartika. It lasts for five days and is a festival of lights. Lamps are lit for the whole five days beside roads and streams, and on roof edges and window sills, to enable Lakshmi, the goddess of beauty, prosperity and good luck, to find her way to every home. Homes are decorated with flowers, and families visit and share festive meals.

### November 15   Shichi-so-san—Seven, Five, Three Festival (Japan)

This day is celebrated in Japan by children who are seven, five, and three years old. They dress in their best clothes, enjoy special candy that is called "thousand year" candy, and are taken to shrines by parents to pray for a long, healthy and happy life.

### November 25   Thanksgiving Day (United States)

This national holiday is a time for giving thanks for the harvest and for the good things the year has brought. The celebration at Plymouth, Massachusetts in 1621 was the first American thanksgiving observance. The first nationwide observance was in 1863, when President Abraham Lincoln issued a proclamation designating the last Thursday of November as a day of national thanksgiving. Congress made Thanksgiving Day a federal holiday in 1941.

### November 29   Nanak's Birthday (Sikh)

Nanak (1469–1538) was the founder of Sikhism, which comes from the Hindi word *sikh,* meaning "disciple." Sikhism, one of the three religions most widely practiced in India, is based on Nanak's teachings about the unity of one god and all peoples.

## In December ...

### December 5   National Day (Thailand)

On this holiday the people of Thailand renew their commitment to democracy while celebrating the king's birthday with religious ceremonies in the temples.

### December 8   Bodhi Day—Buddha's Enlightenment (Buddhist)

Among Mahayana Buddhists, this holiday commemorates Buddha's attaining perfect understanding and happiness. This date is based on the Japanese Buddhist calendar.

### December 9   Chanukah (Jewish)

This Jewish holiday, also called the Festival of Lights, lasts eight days and begins at sundown on December 8. It marks the first recorded battle for religious freedom fought 2,000 years ago, when the Maccabee family led a rebellion against invaders who had captured the city of Jerusalem. It also commemorates the rededication of the Temple by the Maccabees after their victory. The Chanukah menorah, a nine-branched candle-holder, is lit each night in Jewish homes to symbolize the historical and religious signifi-

cance of the holiday. Chanukah is celebrated happily by Jewish families, with songs, games and the exchanging of gifts.

### December 10 Human Rights Day

On this day in 1948 the United Nations General Assembly adopted the Universal Declaration of Human Rights, the first such statement by an international body.

### December 15 Bill of Rights Day

Often marked by presidential proclamation, this day is the anniversary of the adoption of the first ten amendments to the United States Constitution in 1791.

### December 16 Las Posadas (Mexico)

This nine-day celebration is a special Mexican way of commemorating the events that lead up to Christmas. It is observed in Mexico with solemn pageants, candlelight processions and joyful parties. After a religious ceremony on *Noche Buena* (Christmas Eve), there is a fiesta featuring the pinata, a decorated container filled with toys and candy. Children, blindfolded, take turns to try to break the pinata with a wooden stick. When the pinata is broken, the children scramble for the goodies.

### December 25 Christmas (Christian)

On this major Christian holiday, Christians around the world celebrate the birth of Jesus Christ in a humble stable or barn in Bethlehem. For Christians, Jesus Christ is the Saviour, the Son of God. The birth of Jesus is often pictured in a Nativity scene which shows the baby Jesus with parents Mary and Joseph. A message of the season is peace on earth and good will to people everywhere. At Christmas time, many Christians decorate their homes with trees and lights and exchange gifts. They go to church, celebrate with family, and enjoy singing Christmas carols that tell the story of the first Christmas.

### December 26 Kwanzaa (African–American)

Kwanzaa, which begins on December 26 and lasts until January 1, is an African–American holiday that celebrates family life and African–American traditions. The name Kwanzaa means "the first" or "the first fruits of the harvest." Fruits and vegetables are often part of holiday meals because Kwanzaa is based on the harvest festivals of Africa. An important message of Kwanzaa is education. The holiday teaches respect for the family and community, and for learning and sharing African–American traditions and achievements. Every night of Kwanzaa a new candle is lit and placed in the *kinara*—a candleholder with seven branches.

### December 31 New Year's Eve